In the Matter of TUXEDO CONSERVATION AND TAXPAYERS ASSO-CIATION et al., Respondents, v TOWN BOARD OF TOWN OF TUXEDO et al., Respondents, and NEAL MARTINEAU et al., Appellants.

Second Department, July 2, 1979

## APPEARANCES OF COUNSEL

*Rathkopf & Rathkopf (Arden H. Rathkopf* and *Daren A. Rathkopf* of counsel; *Richard F. Babcock, R. Marlin Smith* and *Ross, Hardies, O'Keefe, Babcock & Parsons* on the brief), for Sterling Forest Development Corp. and another, appellants.

*Doig, Cornell & Mandel (Myron Mandel* of counsel), for Neal Martineau, appellant.

*Morgan Finnegan Pine Foley & Lee (Alfred P. Ewert* of counsel), for Tuxedo Conservation and Taxpayers Association and others, respondents.

*Cline, MacVean, Lewis & Sherwin, P. C.,* for Town Board of Town of Tuxedo and others, respondents.

*Louis J. Lefkowitz, Attorney-General (John G. Proudfit, John F. Shea, III, Joseph J. Zedrosser* and *Samuel A. Hirshowitz* of counsel), for the State of New York, *amicus curiae.*

## OPINION OF THE COURT

COHALAN, J.

The Town of Tuxedo, in Orange County, had a population in 1970 (Federal decennial census), of 2,967 persons.

In 1974 Sterling Forest Development Corp. (Sterling) and U.I.D.C. of New York, Inc., filed an application to build a 3,900 residential unit, "Planned Integrated Development", at the rate of not more than 300 units per year, on a plot of about 1,500 acres within the town. The estimated cost of the project was 200 million dollars. The application was denied in 1975 and again in 1976.

In March, 1977 the town board delegated to the planning board the authority to hold environmental impact hearings. In mid-1977, the planning board issued a notice of hearing as to Sterling One. The notice indicated that the town board was the "lead" agency.

There was considerable public opposition to the project because when completed it would—at the average rate of 3 to 3½ persons per unit—quadruple the local population and would strain the available municipal facilities to the breaking point.

On the town board itself there was division. Three were for the project, two against. On Election Day in November of 1977, the complexion of the town board—effective January 1,

1978—changed. The 3 to 2 vote in favor of the application appeared to become 3 to 2 against it.

Although the planning board had been proceeding at its normal tempo, it apparently was not working swiftly enough to satisfy the "lame duck" town board. Hence the latter swung into action with what seemed to be kaleidoscopic rapidity. By a local law passed in late December, 1977 it relieved the planning board of its authority vis-à-vis the environmental aspects of the project and took over the reins.

Despite a request from the Department of Environmental Conservation (D.E.C.) and the State Attorney-General for more time to file written statements on the subject of environmental impact, which request had been acceded to by the planning board, the town board proceeded to grant the necessary preliminary approval to Sterling. It did this on December 28, 1977, realizing that the then town board would be *functus officio* four days later.

In fairness to the town board it should be noted that its members had tried to keep abreast of current developments. Whether they had a full opportunity to make an "informed" decision is a pertinent question (see *Matter of Weekes v O'Connell,* 304 NY 259, 265). We think they did not.

The vote was 3 to 2. The controlling vote in favor was cast by one Martineau, an appellant herein, who, in addition to being a town board member, was and is a vice-president of an advertising agency which numbers City Investing Corp. among its corporate clients.

Sterling is a wholly owned subsidiary of City Investing Corp. It requires no feat of mental gymnastics to infer that if the application is approved, the agency will be a strong contender to obtain all the advertising contracts in the 200 million dollar project.

However, Martineau refused to disqualify himself and instead cast the decisive vote. He did this with a realization of the possible conflict of interest involved. In fact, he went so far as to submit the question of conflict to the local ethics committee, which unfortunately, never responded to his inquiry, probably because of the impending litigation.

The end result, as we know, is that litigation resulted. This CPLR article 78 proceeding was instituted against the town board in its administrative capacity, and against Sterling and U.I.D.C. of New York.

On the threshold question of lack of standing to sue, Special Term held—and we agree—that under the liberalizing principles enunciated in *Matter of Douglaston Civic Assn. v Calvin* (36 NY2d 1), the taxpayers association and the corporate petitioners have standing to sue. In addition, we are of the opinion that the individual petitioners in a community as small as Tuxedo also have the required standing. The aggrieved persons live within a radius of 100 to 1,500 feet from the subject area. We base this holding on the theory that all the petitioners may be adversely affected, *inter alia,* in such matters as noise, water and air pollution and traffic density; and the project will wreak havoc on the Comprehensive Master Plan of 1972, if the decision of the town board is permitted to stand undisturbed.

Reverting now to the December 28, 1977 meeting of the town board, we deplore Mr. Martineau's participation in the vote. Not because of the result, but that he voted at all, even though it may have meant putting the matter over until the advent of the new year. We direct his attention to the soaring rhetoric of Chief Judge CARDOZO in his opinion in *Meinhard v Salmon* (249 NY 458, 464): "A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." This statement was written with reference to a fiduciary, but it should apply as well to public servants.

On behalf of Martineau it is asserted that he did not violate section 809 of the General Municipal Law, which forbids certain specified conflicts of interest. Be that as it may, while the anathema of the letter of the law may not apply to his action, the spirit of the law was definitely violated. And since his vote decided the issue we deem it egregious error.

Thus the question reduces itself into one of interest. Was Martineau's vote prompted by the "jingling of the guinea" or did he vote his conscience as a member of the town board? In view of the factual circumstances involved, the latter possibility strains credulity. For, like Caesar's wife, a public official must be above suspicion.

There is a paucity of cases in this jurisdiction of the precise nature of the case at bar. *Baker v Marley* (8 NY2d 365) is authority for the postulate that public policy forbids an action by a municipality (condemnation proceeding) founded on a vote of a village official who benefited directly and individu-

ally. That case involved a statute, section 332 of the former Village Law, since repealed and re-enacted in diluted fashion by section 802 of the General Municipal Law. The cases that cited *Baker* before the repeal are not of much assistance in our case. (On the general question see *Landau v Percacciolo,* 66 AD2d 80.)

The Annotation at 10 ALR3d 694 covers a number of actions and proceedings in several of our sister States. An amalgam of those cases indicates that the test to be applied is not whether there is a conflict, but whether there might be. Thus, in *Mills v Town Planning & Zoning Comm. of Town of Windsor* (144 Conn 493, 498), the court said: "It is the policy of the law to keep the official so far from temptation as to ensure his unselfish devotion to the public interest."

Pursuing the subject in our own jurisdiction, we can, by analogy, demonstrate instances of conflict of interest involving attorneys. One of the most recent is that of *Cardinale v Golinello* (43 NY2d 288). There it was noted *(supra,* p 296): "The standards of the profession exist for the protection and assurance of the clients and are demanding; an attorney must avoid not only the fact, but even the appearance of representing conflicting interests". And in *Edelman v Levy* (42 AD2d 758) the court held that defendant was entitled to have plaintiff's attorney disqualified from acting in the case on the ground that there was an appearance of a conflict of interest. The court's memorandum noted that: "An attorney must avoid not only the fact, but even the appearance, of representing conflicting interests". We think the case of the *Town of North Hempstead v Village of North Hills* (38 NY2d 334), cited by the appellants, is readily distinguishable with respect to conflict of interest. The happenstance that there four of the five members of the village board owned real estate which met the four-acre requirement, and might, therefore, be reclassified at a later date, is pure speculation, as the court observed *(supra,* p 344): "Nor do we find any merit to petitioners' contention that the individual members of the board acted in an apparent conflict of interest in approving the ordinance and the amendment. None of the members owns any interest in the Gut parcel which was reclassified. Rather, the basis for this claim is that several of the members own parcels of real estate which meet the four-acre requirement and might, therefore, be reclassified R-CL at some future date. This claim is at best speculative."

In contrast, the circumstance that Martineau was voting for his own interests goes far beyond speculation. The probability of his firm getting the advertising contract if the project eventuates is a real one, with the percentage greatly in his and its favor.

Further, as in the *North Hills* case *(supra),* the general rule is expressed in Ann., 133 ALR 1257, 1261-1262 is:

" 'The interest which disqualifies a member of councils to vote is a personal or private one, not such an interest as he has in common with all other citizens or owners of property'. * * *

" 'To say in general terms that a member of a city council cannot vote on the passage of an ordinance providing for the construction of some important public improvement, because he owns real property * * * in the city, when the improvement is a general one, is at once to disqualify every property owner in the city from belonging to the city council, and committing all the material interest of the city to a class of persons who have no property rights to protect.' "

Turning now to the actions of the town board in late December of 1977, we voice our strong disapproval, also, of the unseemly haste by which Martineau and two of his colleagues rammed the resolution through the town board at the time when the planning board was making definite progress towards its goal. Although the latter could not have made the December 31, 1977 deadline, it could have presented its final report and recommendation sometime in January of the new year. This would not per se have resulted in the scuttling of the project because of the change in the membership of the town board, for we must bear in mind that all the old town board had done was preliminary in nature. The hoped for issuance of building permits was still well in the future.

Two hundred million dollar projects are not every day occurrences in a town of the size of Tuxedo. That the planning board moved slowly is a tribute to the caution of its members, and that they gave—or tried to give—additional time to the D.E.C. and to the Attorney-General was an indication of their thorough preparation.

Both D.E.C. and the Attorney-General were concerned with the impact the development would have on the environment. Thus, pursuant to the Environmental Conservation Law, they were quite within their rights in requesting additional time to file their observations and objections, if any. In overriding the

extension granted by the planning board, the town board ignored the time provisions of the Environmental Conservation Law and proceeded to grant the application subject, as above noted, to a list of prerequisites—23 in number—to be met by the applicant before building permits could issue.

We have considered the other arguments raised by the appellants and have found them to be without merit. For the reasons noted, the judgment should be affirmed.

Suozzi, J. P. (dissenting). I dissent and vote to reverse the judgment and dismiss the proceeding.

In this proceeding petitioners sought a judgment reviewing and annulling a resolution of the respondent Town Board of the Town of Tuxedo, dated December 28, 1977, by which it granted to Sterling Forest Development Corporation (Sterling) and U.I.D.C. of New York, Inc., "concept approval, preliminary site plan approval and a special permit for the development of a Planned Integrated Development in the Town of Tuxedo", subject to 23 conditions. These conditions, among other things,

(1) required final site approval for the project,

(2) limited the number of dwelling units to 3,900 or the number permitted under the town zoning law, whichever is less,

(3) imposed a staging of construction so that no more than 300 development units would be built per year,

(4) provided for periodic renewal of the permit,

(5) prescribed continued renewal of the final environmental impact statement, the data furnished in support thereof to ascertain its accuracy, the nature of the impacting action and the degree of its impact, and

(6) mandated construction of a water supply and sanitary sewage system in strict compliance with all local regulations and State laws and regulations, which presumably includes Department of Environmental Conservation (hereinafter D.E.C.) approval.

Special Term granted the petition, annulled the determination of the town board and remanded the matter for further proceedings "at which the DEC, the Attorney General, and the public shall be given a reasonable opportunity to comment on the EIS [environmental impact statement]." In so holding, the Special Term concluded that the town board:

(1) did not allow agencies and the public a reasonable time to comment on a final environmental impact statement (hereinafter FEIS) as required by the State Environmental Quality Review Act (ECL art 8 [hereinafter SEQRA]) and the regulations enacted pursuant thereto;

(2) had abused its discretion in countermanding the planning board's extension of time to the D.E.C. and the Attorney-General to comment on the draft environmental impact statement (hereinafter DEIS);

(3) violated the Public Officers Law by conducting private work sessions regarding this permit without notice; and

(4) had acted illegally in that one of the majority votes in the 3 to 2 vote which approved the special permit was that of a member who was guilty of a "possible *appearance of impropriety"*.

The petitioners also challenged the adequacy of the impact statement at the time of the town board's approval. However, Special Term did not pass on this challenge, except to state that "the essential quality of this EIS is not necessarily a dispositive issue in this proceeding".

For the reasons hereinafter discussed, in my view, none of the grounds advanced by Special Term or the additional ground urged by the petitioners as to the inadequacy of the impact statement are of sufficient weight either individually or collectively to warrant an annulment of the town board's decision made pursuant to the power delegated to it in the zoning ordinance, to grant this approval of (a) a concept of cluster zoning which is consistent with the town's zoning ordinance and (b) a preliminary site plan approval of a planned integrated development conditioned upon (1) final site approval and (2) compliance with all of the other conditions as well as with all of the regulations and requirements of the D.E.C.

Turning first to the alleged violation of the Open Meetings Law (see Public Officers Law, art 7, § 95 *et seq.),* it is true that a court may, "in its discretion, upon good cause shown," declare any action taken in violation thereof to be "void in whole or in part" (Public Officers Law, § 102, subd 1). However, there was no violation of the Open Meetings Law in the case at bar.

The pertinent statute clearly exempts "quasi-judicial proceedings" (Public Officers Law, § 103, subd 1), and Special

Term itself, in discussing the conflict of interest issue, characterized the proceeding before the town board as "quasi-judicial" in nature.

In *Matter of Orange County Pub. Div. of Ottaway Newspapers v Council of City of Newburgh* (89 Misc 2d 847, mod 60 AD2d 409), a zoning board of appeals held a regularly scheduled meeting to consider applications for two zoning variances. A newspaper reporter was allowed to listen to the presentations made for the zoning variances, but was ordered to leave the meeting when the board convened for the purposes of deliberating and making its decision. The board was of the view that this aspect of the meeting was "quasi-judicial" and, therefore, exempt from the mandate of the Open Meetings Law pursuant to subdivision 1 of section 103 of the Public Officers Law.

In the ensuing litigation brought by the newspaper, Special Term held that the zoning board of appeals could conduct its deliberations in private, but that the part of its proceedings in which the decision was announced, and at which the vote of the individual members was taken, had to be open to the public. In affirming that part of Special Term's judgment, this court held (60 AD2d, at p 418): "We agree with Special Term that there is a distinction between that portion of a meeting of the zoning board wherein the members collectively weigh evidence taken during a public hearing, apply the law and reach a conclusion and that part of its proceedings in which its decision is announced, the vote of its members taken and all of its other regular business is conducted. The latter is clearly nonjudicial and must be open to the public, while the former is indeed judicial in nature, as it affects the rights and liabilities of individuals (see *Matter of Hecht v Monaghan,* 307 NY 461; see, also, *Jewish Reconstructionist Synagogue of North Shore v Incorporated Vil. of Roslyn Harbor,* 40 NY2d 158). Accordingly, pursuant to subdivision 1 of section 103 of the Public Officers Law, the deliberations of the Newburgh Board of Zoning Appeals as to the zoning variances are not subject to the Open Meetings Law."

This principle is equally applicable when a legislative body, and not an administrative agency, is authorized to grant a special permit (see *Matter of Lemir Realty Corp. v Larkin,* 11 NY2d 20; *Matter of Lerner v Young,* 286 App Div 1109, mot for lv to app den 1 AD2d 776; *Matter of Lemp v Town Bd. of Town of Islip,* 90 Misc 2d 360).

The town board herein held a public hearing on Sterling's application for special permit on December 8, 1977, and the public hearing was continued and concluded on December 12, 1977. Thereafter, according to the petition the board held work sessions on December 15, 1977, December 19, 1977 and December 27, 1977, which were closed to the public and at which the issue of the permit was weighed.

In view of the afore-noted authorities, petitioners' allegations that these closed work sessions violated the Open Meetings Law are without merit. In any event, the board's decision herein was made only several months after the decision of the Special Term in *Matter of Orange County Pub. v Council of City of Newburgh* (89 Misc 2d 847, *supra).* That decision was the only extant authority construing the meaning of the "quasi-judicial" exemption of the statute. Accordingly, the board acted in good faith in conducting the closed work sessions and its conduct in this respect would not be sufficient to warrant the exercise of discretion by a court in favor of annulling its action (see *Matter of Addesso v Sharpe,* 44 NY2d 925).

With regard to the issue of impropriety, Special Term took note of the fact that Neal Martineau, who voted for the special permit, was a vice-president of an international advertising agency which has as one of its clients the parent corporation of appellant Sterling, and that upon approval of the permit, the agency would actively seek the account for this 200 million dollar project.

Special Term correctly noted that the facts at bar did not come within the purview of section 809 of the General Municipal Law, which lists only four instances where a board member is deemed to have an interest (see *Town of North Hempstead v Village of North Hills,* 38 NY2d 334). Section 809 of the General Municipal Law provides, in pertinent part:

"1. Every application, petition or request submitted for a variance, amendment, change of zoning, approval of a plat, exemption from a plat or official map, license or permit, pursuant to the provisions of any ordinance, local law, rule or regulation constituting the zoning and planning regulations of a municipality shall state the name, residence and the nature and extent of the interest of any state officer or any officer or employee of such municipality or of a municipality of which such municipality is a part, in the person, partnership or association making such application, petition or request (here-

inafter called the applicant) to the extent known to such applicant.

"2. For the purpose of this section an officer or employee shall be deemed to have an interest in the applicant when he, his spouse, or their brothers, sisters, parents, children, grandchildren, or the spouse of any of them

"(a) is the applicant, or

"(b) is an officer, director, partner or employee of the applicant, or

"(c) legally or beneficially owns or controls stock of a corporate applicant or is a member of a partnership or association applicant, or

"(d) is a party to an agreement with such an applicant, express or implied, whereby he may receive any payment or other benefit, whether or not for services rendered, dependent or contingent upon the favorable approval of such application, petition or request."

Nevertheless, although Special Term conceded that there was no evidence of any actual conflict of interest, it held that Martineau should have disqualified himself because of the "possible *appearance of impropriety"*. However, despite the fact that Special Term characterized disqualification as "a factual issue governed by the circumstances of each case and that a definitive rule cannot be formulated", it did not even conduct a hearing on the issue, but decided the issue solely on papers.

Finally, even assuming, *arguendo,* that a conflict of interest existed here, the approval of the special permit by the board would not be voided. In *Town of North Hempstead v Village of North Hills* (38 NY2d 334, 344, n 6, *supra),* the Court of Appeals referred (with apparent approval) to an opinion of the State Attorney-General: "that the failure to make proper disclosure of a conflict of interest would not, per se, invalidate an amendment to a zoning ordinance where all necessary procedural steps had been complied with. (1974 Atty Gen [Inf Opns] 106.)"

Accordingly, this point is similarly without merit.

The other grounds relied upon by Special Term, as well as the additional ground of inadequacy advanced by the petitioners but not passed upon by Special Term, related to alleged violations of SEQRA. In determining the validity of these

grounds, an overview of the factual background is essential at this point.

Sterling initially submitted its proposal for an 3,900 dwelling unit planned integrated development on 1,500 acres in the Town of Tuxedo (hereinafter Sterling One) as far back as 1974. The proposal was turned down in 1975 and again in 1976.

In May, 1977 the town board amended the town's zoning ordinance so that, under specified conditions, a project with the density of Sterling One would be permitted.

In mid-1977, Sterling filed with the town board a combined application for concept approval and preliminary site plan approval of, and a special permit for, Sterling One. The application was referred to the town planning board for its recommendation.

The State Legislature had already enacted the State Environmental Quality Review Act. The purpose of this statute, as conceded in the amended petition and by Special Term, was to insure that environmental factors be assessed and weighed by local agencies and boards when actions having a significant impact on the environment were contemplated by these local agencies and boards. Pursuant to this statute, municipalities were given authority to enact their own local laws to implement SEQRA within their jurisdictions. On March 28, 1977 the town board adopted Local Law No. 3 which authorized the town planning board to determine whether particular proposed actions would have a significant impact on the environment and to supervise the preparation and finalization of requisite environmental impact statements, if necessary.

In mid-July, 1977 the town planning board notified Sterling that its proposed development might have a significant effect on the environment and that an environmental impact statement would be required. The notice designated the town board as the "lead agency" for the contemplated action. A lead agency is defined as "an agency principally responsible for carrying out, funding or approving an action, and therefore responsible for determining whether an environmental impact statement is required in connection with an action, and for the preparation and filing of the statement if one is required" (see 6 NYCRR 617.2 [q]).

The applicant submitted 20 copies of the DEIS on August 1, 1977 which were to be circulated to interested agencies, which included the D.E.C. The DEIS was, in effect, an amplification

of prior environmental statements and materials that Sterling had submitted with its present as well as its prior proposals.

Due to certain defects in the DEIS, the planning board did not grant immediate approval to the DEIS. Rather the planning board called a co-ordination conference for September 24, 1977, to which all agencies and persons interested in the DEIS were invited. It is significant to note that two representatives of the D.E.C. attended this conference, as did all the members of the town board, the planning board and several of the petitioners. Although the planning board had not circulated the DEIS to interested agencies prior to this conference (even though it had received same approximately eight weeks before), it did circulate it at this conference.

On October 24, 1977 the town planning board approved the issuance of a notice of completion of the DEIS and directed publication of a notice that a public hearing would be held thereon on December 7, 1977 and that written comments on the DEIS would be received and considered until December 17, 1977.

The public hearing on the DEIS was held and concluded by the planning board on December 7, 1977. Again, the entire membership of the town board was present at that public hearing but no representative of the D.E.C. was present despite the fact that it had been notified of the hearing. At this hearing, the chairman of the town planning board directed the applicant to prepare the FEIS including a response to the comments that had been received to date and those which would subsequently be filed to an including December 17, 1977.

On December 8, 1977, the night after the planning board's hearing on the DEIS, the town board, pursuant to its power under the zoning ordinance, held a public hearing on Sterling's combined application for a special permit, and the hearing was continued to and concluded on December 12, 1977.

On December 14, 1977 the town board gave notice that on December 21, 1977 it would consider an amendment to Local Law No. 3 of 1977 that would vest the authority to conduct the environmental quality review process in each case in whichever agency was responsible for the approval of the ultimate action, in this case meaning the town board.

On December 15, 1977, just two days before the period granted by the town planning board to comment on the DEIS

had expired, the town planning board received requests from the D.E.C. and the Attorney-General's office for extensions of time to file comments with respect to the DEIS until January 4, 1978. It is significant to note that the D.E.C. was aware of the DEIS since the co-ordination conference in mid-September and had never bothered to comment on the DEIS. Neither the D.E.C. nor the Attorney-General had appeared at the public hearing on the DEIS conducted by the town planning board or the public hearing conducted by the town board on the application for a special permit.

By resolution adopted December 15, 1977, the town planning board granted the D.E.C. and the Attorney-General's requests and extended their time as well as the public's time to comment until January 7, 1978. On December 16, 1977, the D.E.C. confirmed its earlier request for a time extension and submitted certain preliminary comments on the DEIS.

On December 21, 1977 the Town Board of Tuxedo adopted Local Law No. 12, amendment Local Law No. 3 of 1977, effectively giving it, as the lead agency, the responsibility of administering the environmental impact statement process. The town board also reaffirmed the action of the planning board taken at the latter's public hearing by directing the applicant to prepare and file the FEIS.

The applicant, who had already been responding to the comments that had been received on the DEIS, commenced drafting its FEIS.

On December 28, 1977 the town board, at a regularly scheduled meeting, approved by a 3 to 2 vote the Sterling application for the entire 3,900-unit development and granted concept and preliminary site plan approval of, and a special permit for, Sterling One. The resolution of approval contained 23 conditions. The town board also approved the FEIS, issued a notice of completion and approved the filing the FEIS. The FEIS was filed with the main office of the D.E.C. in Albany and the regional office as well. On January 6, 1978, the Attorney-General and the D.E.C. filed their comments to the environmental impact statements.

This CPLR article 78 proceeding was thereafter instituted in May, 1978.

It is against this factual background that the petitioners' challenges to the town board's approval predicated on the claimed violations of SEQRA, must be determined.

Before sustaining petitioners' challenges, Special Term stated (96 Misc 2d 1, 6):

"The fact that the town board substituted itself as the 'lead agency' at the eleventh hour and frenetically worked to reach a conclusion in this matter is not in and of itself a ground to vacate its decision. The question is whether or not under the circumstances the town board had an opportunity to make an 'informed' decision *(Matter of Weekes v O'Connell,* 304 NY 259, 265) * * *

"In any case, since the town board members had access to the data accumulated prior to the date they assumed the role as 'lead agency,' they could have been in a position to make an 'informed' decision *(Matter of Taub v Pirnie,* 3 NY2d 188, 194-195)."

As Special Term described it (pp 6-7), "[t]he basic contention of the petitioners [which Special Term apparently adopted] is that the respondents did not comply with either the letter or the spirit of the SEQRA and the DEC's implementing regulations (6 NYCRR Part 617) during the latter part of December, 1977 when the final and crucial stages of the EIS procedures were completed pell-mell by the town board."

In upholding this contention, Special Term relied upon (1) the town board's failure to comply with the timetable prescribed by SEQRA for processing the impact statement, thereby depriving State agencies and the public of a statutory right to a reasonable time period in which to consider the final EIS, and (2) the town board's implicit countermanding of the "resolution of the Planning Board with respect to the time extension granted by the latter for the DEC and the Attorney General to comment on the DEIS."

It is clear from a reading of SEQRA and the pertinent zoning statutes and regulations that the timetable for the processing of impact statements and the exercise of the town board's right to act on the application herein under the zoning ordinance are not parallel. In fact, they are so different as to make it practically impossible to reconcile and co-ordinate.[1] In recognizing that the SEQRA timetable might conflict with other statutes and regulations, SEQRA makes it abundantly clear that its provisions are to be implemented so as to harmonize with and not prevent the expeditious exercise of

1. (See Town of Tuxedo Zoning Ordinance, § 5.9.7.4, subds b, d; ECL 8-0109, subd 5; 6 NYCRR 617.8 [d] [2], 617.8 [e] [2] [i] [ii] [iii].)

the town board's exercise of its zoning powers. In this regard, Environmental Conservation Law 8-0107 and 8-0109 (subd 5) are illustrative and, respectively, provide as follows:

"They [all agencies] shall carry out its terms and minimum procedural and administrative delay, shall avoid unnecessary duplication of reporting and review requirements by providing, where feasible, for combined or consolidated proceedings, and shall expedite all proceedings hereunder in the interests of prompt review.

"Notwithstanding the specified time periods established by this article, an agency shall vary the times so established herein for preparation, review and public hearings to coordinate the environmental review process with other procedures relating to review and approval of an action."

In the face of this statutory language, it is my view that this claimed violation of the SEQRA timetables is not a viable basis for annulling the town board's action. Nor, in my opinion, is the town board's countermanding of the extension of time given to the D.E.C. and the Attorney-General to comment on the DEIS an appropriate basis for this drastic action.

As Sterling points out, although the town planning board could extend the date of the hearing on the DEIS, and the date by which the FEIS could be completed, there was no express authority either in SEQRA, the regulations promulgated pursuant thereto, or Local Law No. 3 for it to grant an extension as to the period in which comments on the DEIS could be received. Therefore, argues Sterling, the extension given by the town planning board was invalid and could be countermanded by the town board when it assumed control of the environmental impact process.

However, even if the town planning board could extend the time to comment on the DEIS, at best the extension was a matter of discretion and had to be exercised so as to be in harmony with the town board's exercise of its power under the zoning ordinance. Under the circumstances, it can be persuasively argued that the planning board abused its discretion in granting the extension for the following reasons:

(1) The D.E.C. and the Attorney-General never gave a satisfactory reason for failing to avail themselves of the ample opportunity to comment on or before December 12, 1977;[2]

---

2. The Department of Planning of Orange County found the opportunity to timely comment on the DEIS. It supplied written comments at the public hearing on the

(2) The extension was given a day after the planning board was put on notice that the town board was contemplating a take-over of the environmental impact process; and

(3) The extension would effectively delay the whole matter to 1978. In view of the election conducted in 1977 which resulted in the election of a new town board, quite apart from the 2 to 2 split which may have resulted on a vote of this issue, it would have presumably necessitated starting the application process anew. The inevitable delay and the unfair penalty imposed upon the property owner as the result, are too obvious to require further comment.

Under these circumstances, the elimination of this discretionary extension by the town planning board could not serve as a ground for annulling the board's resolution which was granted in the legitimate exercise of its powers under the zoning ordinance. Clearly, if the town board had the right to substitute itself as the supervising agency for the purpose of co-ordinating the environmental impact process, it also clearly had the power to exercise its discretion and withdraw the extension of time granted by the town planning board.

In any event, the D.E.C. and the Attorney-General submitted their comments in early January, 1978. If, in fact, the conditions imposed by the town board's resolution of December 28, 1977 did not adequately address these additional comments, there was no impediment to the new town board taking the appropriate action, if any, required to provide the safeguards prompted by these additional comments. Other than to submit a letter in connection with this appeal to indicate its support of the petitioners' position, the new board presumably took no other action. Inasmuch as these comments were available to Special Term too, it is not readily apparent how a remand for "a reasonable opportunity to comment" will serve any beneficial purpose or otherwise promote the purpose and objectives of SEQRA.

Notwithstanding the availability of these comments, Special Term did not pass on the most relevant issue, to wit, did the town board's resolution of December 28, 1977 substantially incorporate and reflect the environmental concerns raised by these comments?

---

DEIS, and in a transmitted letter stated: "We have determined that the applicant has the capacity to properly rectify all potentially adverse environmental and traffic impacts. In fact, if some of these concerns are not resolved the project will not receive approval by DEC."

In the absence of significant judicial interpretation of SEQRA, an overview of this legislation may provide a better perspective as to respective purposes and objectives of SEQRA and the pertinent zoning ordinances and regulations pursuant to which the town board purported to act. Such a perspective may be useful in determining whether the town board's resolution did or did not (a) give appropriate consideration to the environmental concerns reflected in the comments presented by the public, the D.E.C. and the Attorney-General in accordance with the intent and spirit of SEQRA and (b) incorporate sufficient safeguards against the adverse environmental impacts which the Sterling One project would inevitably produce.

As the Attorney-General succinctly explains in his *amicus curiae* brief on behalf of the State, SEQRA was enacted in 1975 and "was primarily patterned on the National Environmental Policy Act of 1969 ('NEPA'), 42 U.S.C.A. § 4321 *et seq.* * * * NEPA has three basic requirements. First, a federal agency must include in every recommendation or report on a major federal action significantly affecting the quality of the human environment 'a detailed statement by the responsible official on—(i) the environmental impact of the proposed action' * * * Second, NEPA requires that, in addition to preparing an EIS, a federal agency must insure that environmental values and amenities are actually considered in its decision-making. 42 U.S.C.A. § 4332(2)(B). Third, a federal agency, to the fullest extent possible, must interpret and administer the laws and regulations of the United States in accordance with specified substantive policies for the protection of the environment. 42 U.S.C.A. §§ 4332(1), 4331(b)."

By 1974 the progress made under NEPA had already been described as constituting "a giant stride toward revitalization of the bureaucratic processes that have for so long neglected environmental values" (Anderson, National Environmental Policy Act in Federal Environmental Law, p 239). Yet, at that time New York still lacked a generally applicable environmental evaluation procedure and a general standard for decision-making where environmental and other concerns were involved. SEQRA was enacted to remedy these deficiencies (see Sandler, State Environmental Quality Review Act, 49 NY State Bar J 110, 112).

While it cannot be denied that SEQRA focused attention on environmental concerns and issues more directly and on a

broader base than any other legislation, this sweeping generalization is not entirely factual or accurate. It completely ignores the substantial advances which had been made in the area of zoning legislation and subdivision regulations in the recognition of and protection of our environmental resources against the adverse impacts associated with residential developments of the type included under the categoy of Type I actions to which SEQRA is applicable long before this legislation appeared on the scene.

The legislative intent which was applied more broadly and generally to all government and private endeavors requiring governmental approvals by SEQRA and defined in Environmental Conservation Law 8-0103 (subds 7, 9) had been stated earlier with more limited application in the enabling statutes by which the Legislature conferred upon political subdivisions the power to zone and authorized them to require that plans submitted for the approval of residential subdivisions specify elements that have an adverse impact on the environment.[3] Section 274-a of the Town Law clearly illustrates this principle. That statute provides:

"Planning board approval of site plans and certain uses.

"1. a. Planning board approval of site plans. The town board may, as part of a zoning ordinance adopted pursuant to this article or by local law adopted pursuant to other enabling law, authorize the planning board to review and approve, approve with modifications or disapprove site plans, prepared to specifications set forth in the said zoning ordinance or local law and/or in regulations of the planning board, showing the arrangements, layout and design of the proposed use of the land shown on such plan. Such ordinance or local law shall specify the uses for which such approval shall be required and the elements to be included in such plans submitted for approval; such elements may include, where appropriate, those relating to *parking, means of access, screening, signs, landscaping, architectural features, location and dimensions of buildings, impact of the proposed use on adjacent land uses and such other elements as may reasonably be related to the health, safety and general welfare of the community*" (emphasis supplied).

Pursuant to such enabling legislation, many municipalities have adopted zoning ordinances and subdivision regulations,

3. (See Town Law, §§ 261, 263, 272-a, 274-a.)

of which section 5.9 of the Town of Tuxedo Zoning Ordinance, entitled "Planned Integrated Development Regulations and Procedures", is an example, to achieve objectives such as "[v]ariety of housing types and ownership capabilities * * *, [u]sable open space, recreational facilities * * * [m]aximum preservation of outstanding topographical, geological, and water resource features of the site" (Town of Tuxedo Zoning Ordinance, §§ 5.9.2.1, 5.9.2.2, 5.9.2.4). In actuality, SEQRA merely reinforces and expands the environmental considerations implicit in the zoning ordinances and regulations of a municipality.

The pre-SEQRA concern of zoning ordinances and subdivision regulations with environmental issues is underscored by the submission of impact statements and materials by Sterling with its application before SEQRA required them. The post-SEQRA statements were an amplication of the impact documents submitted earlier.

Nothing in the legislative history, language or spirit of SEQRA suggests that this legislation in any way diminishes a town board's right to exercise the powers duly granted to it by its properly enacted zoning laws. Rather, there emerges the more reasonable principle that SEQRA was designed to supplement, not supplant, the zoning ordinances and regulations. Thus, SEQRA cannot be legitimately construed, applied or invoked as a legal device to prohibit that which the zoning legislation permits or to frustrate and unduly delay private endeavors which are consistent with a municipality's duly enacted zoning ordinance and regulations.

Applying this principle to the specifics of this case, it is undisputed that the cluster zoning for which the concept approval, preliminary site plan approval and special permit were sought was clearly contemplated by and consistent with the town's zoning ordinance, which has not been challenged. In passing upon this application, the primary and legitimate objective of the town board was not how to prohibit, frustrate or delay this private endeavor but, rather, how to regulate it in accordance with the spirit and intent of both the town's zoning ordinance and regulations and SEQRA and thereby provide for the maximum protection of the environment.

It is with this proscription and a realistic appraisal of the nature of the town board's resolution that the compliance or lack of compliance of this resolution with SEQRA must be determined.

It is of the utmost significance to recognize that the approval granted on December 28, 1977 was a very limited one which did not authorize and permit any building or construction. It was a preliminary approval and constituted the first step in a multi-step process written into the town's zoning ordinance throughout which environmental factors are subject to continuing consideration and evaluation before the contemplated project can begin, much less be completed.

In the rather extensive presentations and objections raised in opposition to the town board's action, it is not apparent how more protracted discussions and prolonged consideration of this preliminary application would have assisted the town board in making a more informed determination than was actually made. Nor is it discernible that additional comments by anyone would have resulted in more stringent conditions for the protection of the environment than those which are an integral part of the board's approval. In challenging the town board's failure to comply with the SEQRA procedures and otherwise generally alleging the deficiencies of the town's action, neither the petitioners nor the Attorney-General have presented anything concrete or specific to demonstrate that the conditions imposed in the resolution do not effectively meet and adequately deal with the adverse environmental impacts suggested by all of the comments presented. Short of requiring the applicants to file detailed plans for the sewage, water and drainage facilities and all other improvements contemplated by this project, it is not at all clear what additional information, material or documents the applicants should have been required to submit at this initial stage of the project, or what additional conditions or safeguards should have been imposed by the town. Any requirements which would have necessitated more detailed plans than were actually available at this initial step, would seem to be designed more to delay and hopefully frustrate this project than to reasonably regulate it. The conditions imposed constitute an unequivocal mandate that the applicant rectify all of the potentially adverse environmental impacts reflected in the comments made before and after the December 28, 1977 resolution with the inherent caveat that if these conditions are not complied with, this project cannot proceed. As the Attorney-General concedes and as the Planning Department of Orange County has recognized, compliance necessitates D.E.C. approval of many critical aspects of the project before construction can commence.

Despite this concession, the Attorney-General contends that "post-approval 'review' of the environmental impacts of Sterling One * * * is no substitute for assessment and consideration of those impacts before the Approvals are granted." However, the case cited by the Attorney-General for his contention *(Natural Resources Defense Council v Callaway,* 524 F2d 79) is completely distinguishable from the case at bar. In *Natural Resources Defense Council v Callaway (supra),* the approval was for a permit to dump polluted spoil. In such a situation, postapproval review would obviously be too late to prevent an adverse environmental impact. In the case at bar, the action of the town board is merely a preliminary approval of a concept. There is ample time for any additional environmental problems to be considered and for the plan to be updated before construction actually commences.

The preliminary approval which is challenged in this proceeding reflects good faith consideration by the town of all the adverse environmental impacts attendant upon the project. This is evident in the conditions imposed which will involve D.E.C. review and for which approval will be required *before* construction is approved and not *after* it is underway.

Contrary to the unsupported assertion advanced by the petitioners, the D.E.C. and the Attorney-General, the town board has not ignored the relevant environmental concerns. Rather, its action reflects appropriate consideration of the environmental issues involved and has incorporated therein sufficient conditions to insure that the adverse impacts are rectified in accordance with the applicable standards of SEQRA and the town's zoning and building requirements.

Accordingly, for all of these reasons, the judgment appealed from should be reversed and the proceeding dismissed.

O'CONNOR and GULOTTA, JJ., concur with COHALAN, J.; SUOZZI, J. P., dissents and votes to reverse the judgment and dismiss the proceeding on the merits, with an opinion.

Judgment affirmed, with $50 costs and disbursements to petitioners payable jointly by appellants Sterling Forest Development Corp. and U.I.D.C. of New York, Inc.