PINEY MOUNTAIN NEIGHBORHOOD ASSOCIATION, INC. v. TOWN OF CHAPEL HILL, NORTH CAROLINA; JOSEPH L. NASSIF, MAYOR AND MEMBER OF THE TOWN COUNCIL OF THE TOWN OF CHAPEL HILL; R. D. SMITH, JOSEPH STRALEY, MARILYN BOULTON, WILLIAM THORPE, BEV KAWALEC, JONATHAN HOWES, JOSEPH A. HERZENBERG, AND JAMES WALLACE, MEMBERS OF THE TOWN COUNCIL OF THE TOWN OF CHAPEL HILL; AND CHAPEL HILL HOUSING AUTHORITY

No. 8215SC705

(Filed 5 July 1983)

1. **Municipal Corporations § 31.1— special use permit—judicial review—standing of corporation representing property owners**

    A corporate petitioner who has no property interest in an area affected by a special use permit but which represents individuals who live in the affected area and who potentially will suffer injury by the issuance of the permit has standing to seek judicial review of a municipality's action in approving an application for a special use permit.

2. **Municipal Corporations § 30.6— special use permit—conformity of project with land use plan—sufficiency of evidence**

    In determining whether to issue a special use permit for a housing authority's subsidized multi-family housing project, the evidence supported the town council's finding that the project conformed with the town's comprehensive land use plan where the project was clearly within the density range favored by the plan, it did not result in undue racial or income group concentration, and the percentage of subsidized housing that would be created in the subcommunity was not significantly beyond the recommended guidelines, particularly when the projected long range urban growth of the subcommunity is considered.

Piney Mt. Neighborhood Assoc. v. Town of Chapel Hill

3. **Municipal Corporations § 30.6— special use permit—housing project—public necessity**

A finding that a proposed subsidized multi-family housing project was a public necessity was supported by evidence that those eligible for public housing or rent assistance in the town far exceeded the resources available; only one new apartment project was planned in the area, and it was expected to be converted to condominiums; and 40 of the 42 assisted housing families in the area were at the opposite end of the subcommunity.

4. **Municipal Corporations § 30.6— special use permit—housing project—maintaining value of contiguous property**

A finding that a proposed subsidized multi-family housing project was designed to maintain the value of contiguous property was supported by evidence that the proposed development was on a scale compatible with area residences and arranged so as to minimize the visual impact of its relatively higher density, and that these factors were calculated to maintain surrounding values, and by evidence that studies in other areas had shown that public housing projects did not adversely affect nearby residential values.

5. **Municipal Corporations § 30.6— special use permit—no failure to comply with zoning regulations**

A town council did not fail to comply with its own zoning regulations by failing strictly to apply the three per cent subsidized housing distribution standard of its comprehensive land use plan in determining whether to issue a special use permit for a public housing project where the whole record supported a finding that the project conformed to the general, advisory guidelines of the comprehensive plan.

6. **Municipal Corporations § 30.6— special use permit—requirement that council review record of public hearing**

A town council adequately complied with a zoning ordinance's mandate that it "review the record of the public hearing" in determining whether to issue a special use permit where members of the council were present at both the public hearing and the meeting at which the permit was approved; the public hearing was only seven days before final decision on the application for the permit, and the public testimony thus was fresh in the council members' memories; the council did have all documentary evidence introduced at the hearing, much of which duplicated oral testimony, and which comprised a large portion of the hearing record; and several council members professed adequate familiarity with the hearing through personal recollections and notes and review of the documents introduced.

7. **Municipal Corporations § 30.22— special use permit—sufficiency of findings**

A town council made sufficient findings in ruling on an application for a special use permit where the findings merely tracked the language of the applicable ordinance without enumerating specific facts in the record which supported the findings, since the findings were sufficiently specific to enable the reviewing court to determine whether they were substantially supported by the record and thus whether the council's decision was arbitrary.

8. **Municipal Corporations § 31.2— approval of special use permit—review in superior court**

  The superior court did not impermissibly substitute its own findings for those of a town council in affirming the council's approval of an application for a special use permit but merely made findings regarding the evidence in the record which, although at times contradictory, on the whole supported the councils' findings.

APPEAL by petitioner from *Martin (John C.), Judge*. Judgment entered 8 February 1982 in Superior Court, ORANGE County. Heard in the Court of Appeals 12 May 1983.

Petitioner appeals from a judgment affirming the action of respondent Town of Chapel Hill (hereafter Town), through its Town Council (hereafter Council), in issuing a special use permit to respondent Chapel Hill Housing Authority (hereafter Authority) to construct a subsidized multi-family housing project in a subcommunity where a large number of petitioner's members reside, and refusing to enjoin the Town from granting the special use permit.

*Parker, Sink, Powers, Sink & Potter, by William H. Potter, Jr., for petitioner appellant.*

*Haywood, Denny & Miller, by Michael W. Patrick, for respondent appellees.*

WHICHARD, Judge.

I.

A threshold question of petitioner's standing to challenge the Council's approval of the special use permit must be determined.

Only an aggrieved party may appeal the grant or denial of a special use permit. *See Pigford v. Bd. of Adjustment*, 49 N.C. App. 181, 182-83, 270 S.E. 2d 535, 536 (1980), *disc. rev. denied and appeal dismissed*, 301 N.C. 722, 274 S.E. 2d 230 (1981); *In re Coleman*, 11 N.C. App. 124, 127, 180 S.E. 2d 439, 441 (1971). The appellant must, therefore, have "some interest in the property affected." *Pigford*, 49 N.C. App. at 182-83, 270 S.E. 2d at 536.

In its petition for writ of certiorari from the superior court, petitioner alleged, and neither the Town nor the Authority denied, that its membership included more than 150 families

residing in the area where the housing project is proposed to be built. If the individual members were the petitioners here, they would clearly have an interest in the property affected by the housing project as residents of the neighborhood where the project is to be located, and they would be potentially aggrieved by any decline in the use or value of their property that resulted from the housing project. Respondents contend, however, that the corporate petitioner is without standing because it has no ownership or other interest in neighborhood property.

[1] The question whether an association of property owners may have party aggrieved standing under appropriate circumstances has received varying answers, *see* Annot., 8 A.L.R. 4th 1087 (1981). Although our Courts have not addressed this issue, we take note of the trend in other jurisdictions toward relaxing strict procedural requirements involving standing. *See id.* We thus hold that where, as here, a corporate petitioner has no property interest, but represents individuals who live in the affected area and who potentially will suffer injury by the issuance of a special use permit, such petitioner has standing to seek judicial review of the municipality's action in approving an application for a special use permit. *See, e.g., Residents of Beverly Glen, Inc. v. Los Angeles,* 34 Cal. App. 3d 117, 109 Cal. Rptr. 724 (1973); *Tuxedo Conservation & Taxpayers Assoc. v. Town Board of Town of Tuxedo,* 96 Misc. 2d 1, 408 N.Y.S. 2d 668, 669-70 (1978), *aff'd,* 69 A.D. 2d 320, 418 N.Y.S. 2d 638 (1979); Annot., *supra,* at § 5[a].

## II.

The scope of judicial review of a town council's decision on an application for a special use permit must include:

(1) Reviewing the record for errors in law,

(2) Insuring that procedures specified by law in both statute and ordinance are followed,

(3) Insuring that appropriate due process rights of a petitioner are protected including the right to offer evidence, cross-examine witnesses, and inspect documents,

(4) Insuring that decisions of town boards are supported by competent, material and substantial evidence in the whole record, and

(5) Insuring that decisions are not arbitrary and capricious.

*Concrete Co. v. Board of Commissioners*, 299 N.C. 620, 626, 265 S.E. 2d 379, 383, *rehearing denied*, 300 N.C. 562, 270 S.E. 2d 106 (1980). Both the superior court and the Court of Appeals are bound by the foregoing scope of review. *Id.* at 627, 265 S.E. 2d at 383.

### III.

The Chapel Hill Zoning Ordinance provides that

[no] Special Use Permit . . . shall be approved by the Council unless each of the following findings is made concerning the . . . planned development:

> a) That the . . . development is located, designed, and proposed to be operated so as to maintain or promote the public health, safety, and general welfare;
>
> b) That the . . . development complies with all required regulations and standards of [the Zoning Ordinance], including all applicable provisions of Articles 4, 5, and 6 and the applicable specific standards contained in Sections 8.7 and 8.8, and with all other applicable regulations;
>
> c) That the . . . development is located, designed, and proposed to be operated so as to maintain or enhance the value of contiguous property, *or* that the . . . development is a public necessity; and
>
> d) That the . . . development conforms with the general plans for the physical development of the Town as embodied in [the Zoning Ordinance] and in the Comprehensive Plan.

Chapel Hill Zoning Ordinance § 8.3 (1981) (emphasis supplied). The Council made the above required findings by merely reciting the language of the ordinance, without expressly relating it to the particular circumstances of the application. The Council made both alternative findings specified in section 8.3(c).

IV.

Petitioner contends that certain required findings are not supported by competent, material, and substantial evidence in the whole record.

In applying the whole record test, "the court may not consider the evidence which in and of itself justifies the [agency's] result, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Thompson v. Board of Education,* 292 N.C. 406, 410, 233 S.E. 2d 538, 541 (1977). *See Jennewein v. City Council of Wilmington,* 62 N.C. App. 89, 93, 302 S.E. 2d 7, 9 (1983).

[2]  Petitioner contends the findings that "the development conforms with the general plans for the physical development of the Town as embodied in the Zoning Ordinance and in the Comprehensive Plan," and that it complies with applicable standards in the Zoning Ordinance are not supported by substantial, competent, and material evidence in the whole record. Specifically, petitioner contends the development does not conform to the provisions of the Comprehensive Plan involving distribution of subsidized housing, concentrations of racial or income groups, and residential density.

The following provisions of the Comprehensive Plan are pertinent:

Residential uses in the subcommunities have been divided into low density residential, with a density of from 1 to 7 dwelling units per acre, and high density residential, with a density of from 7 to 15 dwelling units per acre . . . .

. . . .

Low density residential use is the most flexible use when allocating space in the urban area . . . .

One Town objective is a "full range and mix of residential uses including various . . . densities (low to high), and cost levels (low to high) in each sector". . . .

. . . It is recognized that there is a critical need for moderate cost housing in Chapel Hill. . . . [T]o meet this need . . ., moderately priced low density housing located in primarily

single family areas [is] the goal. To accomplish this, develop-
ment at the higher end of the low density housing range, i.e.,
5 to 7 dwelling units/acre is encouraged . . . .

. . . In order to implement the Town policy of providing
"housing for persons of limited means . . . locate(d)
throughout residential areas of the community, providing
choice of location and preventing undue concentration of
racial or income groups," the current average, or 3%, of the
housing units in each subcommunity should be subsidized for
low and moderate income persons. . . . This standard should
be used in evaluating the location of future subsidized units.

*Town of Chapel Hill Comprehensive Plan, Land Use Report* 11-12
(December 1977).

A review of the whole record reveals the following pertinent
evidence:

The uncontroverted density of the proposed development is
approximately 5.8 dwelling units per acre. Petitioner presented
evidence that the subcommunity in question has had 4% subsi-
dized housing, and after construction of the proposed develop-
ment there would be 7% subsidized housing. Contrary evidence
was presented that the rate of subsidized housing in the subcom-
munity in July 1977 was 4%, as of July 1981 it was 2.96%, and
the proposed development would raise it to 5.11% if it were oc-
cupied at this time. Further, the subcommunity in question is one
of the town's largest and has substantial population growth poten-
tial in the coming years, and the Comprehensive Plan con-
templates long range development over at least a ten to fifteen
year period. Although the subcommunity was in the past primari-
ly rural and black, recent development has seen increased urban
development, primarily white, and only slight changes in the
black population.

We agree with the superior court's finding that "the Com-
prehensive Land Use Plan does not set forth mandatory zoning
requirements, but consists of general goals, standards and
guidelines for the implementation of zoning policy." The Plan is,
by its express terms, merely advisory:

The Plan does *not* by itself specify the future use of a par-
ticular piece of land; the Plan must be implemented by ap-

propriate ordinances, policies, and private sector initiative. It does not guarantee development or nondevelopment of a specific site; it sets forth broad outlines to guide land use decisions of the private and public sector.

*Comprehensive Plan, supra,* at 1. A comprehensive plan "is a policy statement to be implemented by zoning regulations, and it is the latter that have the force of law." 82 Am. Jur. 2d, Zoning and Planning § 69, at 502. It "is generally deemed to be advisory, rather than controlling, and it may be changed at any time." *Id.* at 503.

Taking due note of the advisory nature of the Comprehensive Plan, we find that the above material and competent evidence, taking contradictions into account, substantially supports the finding that the development conforms with the general plans for physical development of the Town. The development is clearly within the density range favored by the plan, it does not result in undue racial or income group concentration, and the percentage of subsidized housing that will thereby be created in the subcommunity is not significantly beyond the recommended guidelines, particularly when the projected long range urban growth of the subcommunity is considered.

With regard to the Comprehensive Plan's guidelines for racial group concentration, we note that "municipal restrictions upon the use and occupancy of property as affected *solely* by the racial status of the proposed occupant . . . [are] . . . beyond the reach of the police power." *Clinard v. Winston-Salem,* 217 N.C. 119, 123, 6 S.E. 2d 867, 870 (1940) (emphasis supplied).

[3] Petitioner contends there is no evidence that this development in particular is a public necessity, but only that public housing is a "general necessity." Detailed evidence was introduced showing that those eligible for public housing or rent assistance in Chapel Hill far exceed the resources (vacancies and allocations) available. The area of the proposed housing project was said to be overwhelmingly moderate to high income. Only one new apartment project is planned in the area, and it is expected to be converted to condominiums. Forty of the forty-two assisted housing families in the area are at the opposite end of the subcommunity from the proposed development. Petitioner offered no material contradictory evidence. We hold that the foregoing constitutes

substantial evidence to support the finding that the proposed development is a public necessity.

[4]   Petitioner contends that a review of the whole record fails to provide substantial support for the finding that "the development is located, designed, and proposed to be operated so as to maintain or enhance the value of contiguous property."

The pertinent evidence is as follows:

Petitioner's president expressed the opinion that "we are sure, and we have yet to see here any proof to the contrary, that our property values will go down." Two other residents of the subcommunity said that their willingness to purchase homes in the area would have been affected had the housing project been completed at the time of their purchases, and that it had already affected surrounding property values. One witness commented that "several homes . . . have not sold."

Evidence was presented that the proposed development is residential, on a scale compatible with area residences, and arranged so as to minimize the visual impact of its relatively higher density, and that these factors are calculated to maintain surrounding values. Reference was made to a study in Portland, Oregon, which found that public housing projects did not adversely affect nearby residential values. A survey of property values near another public housing project in Chapel Hill was introduced, which found not only no "long-term loss in property values," but also that "properties closest to Public Housing ha[d] a slightly higher valuation."

A man who formerly resided adjacent to the housing project subject to this study stated that "when [he] sold that house, [he] didn't tell the person what [the housing project] was . . . . That's why the real estate value did not drop there[,] because [he]'d be crazy to tell it, what that project back there was."

A witness expressed the opinion that "over time, there is not an adverse effect except where the neighborhood is otherwise weak . . . ."

The foregoing opinions by residents of the area that the value of neighboring property would be adversely affected by the housing project, as well as the opinion that only weak neigh-

borhoods would be adversely affected, insofar as they are "conclusions unsupported by factual data or background, are incompetent and insufficient to support the [Council's] findings." *Refining Co. v. Board of Aldermen*, 284 N.C. 458, 469, 202 S.E. 2d 129, 136 (1974).

Without considering incompetent opinions regarding value, we hold that the above-stated physical plans for the housing project, along with the results of studies in other areas, substantially support the finding that the development is designed to maintain the value of contiguous property.

V.

A municipality considering an application for a special use permit for a housing project is constrained by the following statutory and common law principles:

"All housing projects of an authority shall be subject to the planning, zoning, sanitary and building laws, ordinances and regulations applicable to the locality in which the housing project is situated." G.S. 157-13 (1982).

> The [zoning] regulations may . . . provide that the board of adjustment or the city council may issue special use permits or conditional use permits in the classes of cases or situations and in accordance with the principles, conditions, safeguards, and procedures specified therein . . . . When issuing or denying special use permits or conditional use permits, the city council shall follow the procedures for boards of adjustment [with one exception] . . ., and every such decision of the city council shall be subject to review by the superior court by proceedings in the nature of certiorari.

G.S. 160A-381 (1982).

"[I]n passing upon an application for a special permit, a [town council] may not violate at will the regulations it has established for its own procedure; it must comply with the provision[s of the applicable ordinance." *Refining Co., supra*, 284 N.C. at 467, 202 S.E. 2d at 135. This requirement is necessary in order to accord due process and equal protection to applicants and to refute charges that any denial is an arbitrary discrimination against the property owner. *Id.* at 468, 202 S.E. 2d at 135.

A denial of the permit should be based upon findings contra which are supported by competent, material, and substantial evidence appearing in the record. [Citations omitted.] In no other way can the reviewing court determine whether the application has been decided upon the evidence and the law or upon arbitrary or extra legal considerations.

*Id.* at 468, 202 S.E. 2d at 136.

When a town council conducts a quasi-judicial hearing to determine facts prerequisite to issuance of a permit, it "can dispense with no essential element of a fair trial." *Id.* at 470, 202 S.E. 2d at 137. The applicant must have the opportunity to give evidence, cross-examine witnesses, and inspect documents; and unsworn statements may not be used to support findings absent waiver or stipulation. *Id.* Finally, "in allowing or denying the application, [the Council must] state the basic facts on which it relied with sufficient specificity to inform the parties, as well as the court, what induced its decision." *Id.* at 471, 202 S.E. 2d at 138.

Petitioner contends the Council violated the foregoing requirements in several ways.

[5] First, by failing strictly to apply the three per cent subsidized housing distribution standard, and taking into account a long range view, the Council failed to require conformance with the Comprehensive Plan and thus "violate[d] at will the regulations it has established for its own procedure." *Refining Co., supra.* Because we have held that the whole record supports the finding that the development conforms to the general, advisory guidelines of the Comprehensive Plan, we find petitioner's attempt to require strict, technical compliance with the Plan under this alternative theory unavailing. Indeed, the Council must comply with its own zoning regulations, but the regulations only call for conformance with a Comprehensive Plan which is, by its own terms, merely advisory.

[6] Second, petitioner contends the Council failed to follow its own zoning regulations by not having before it a written transcript of the previous public hearing when it acted on the application for the special use permit.

The zoning ordinance requires that the Town Manager analyze an application for a special use permit and submit a re-

port to the Planning Board, which reviews the application and the Manager's report, and then submits a recommendation of the action to be taken to the Town Council. Chapel Hill Zoning Ordinance § 8.4.1-.5. After receipt of the Planning Board's recommendation, the Council must hold a public hearing on the application, and "[a] record of the proceedings of the hearing shall be made and shall include all documentary evidence presented at the hearing." *Id.* at § 8.4.6. The Town Manager then reviews the record of the public hearing and submits a recommendation for action to the Council. *Id.* at § 8.4.7. The Council then "shall review the record of the public hearing, the Planning Board's recommendation, and the Town Manager's report and shall take action on the application based on findings as to the determinations required in Section 8.3. All findings shall be based on reliable evidence presented at the public hearing." *Id.* at § 8.4.8.

The public hearing on the Authority's application was held on 21 September 1981. On 28 September 1981 the Council met and voted to approve the application. The Town Attorney advised the Council at the 28 September meeting that no completed summary of the public hearing was then available, but that the minutes of the meeting would not necessarily contain all the evidence heard and it was the task of Council members to form a decision based on their recollection of the evidence presented.

Although the ordinance requires the Council to "review the record" of the public hearing, it does not specify what form the record must take, other than requiring inclusion of all documentary evidence. It is not specified whether a verbatim transcript, a narrative summary (*i.e.*, minutes), or a tape recording will suffice.

We believe the intent of the ordinance is to insure that the Council is sufficiently familiar with, and thus gives proper consideration to, the evidence presented at the hearing. Members of the Council were present at both the 21 September public hearing and the 28 September meeting. The hearing was only seven days before final decision on the application, and the public testimony thus was fresh in the Council members' memories. Further, the Council did have all documentary evidence introduced at the hearing, much of which duplicated oral testimony, and which comprised a large portion of the hearing record. Finally, several Council members at the 28 September meeting, although express-

ing concern that absence of a written record might be subsequently attacked as a procedural irregularity, professed adequate familiarity with the hearing through personal recollections and notes, and review of the documents introduced. In light of these circumstances, we hold that the Council adequately complied with the ordinance's mandate that it "review the record of the public hearing."

[7] Petitioner next contends the Council made insufficient findings of fact in that it merely tracked the language of the ordinance in section 8.3, *supra*, and did not enumerate specific facts in the record that supported those findings.

The courts have required municipal agencies to make findings when ruling on an application for a special use permit, *e.g., Refining Co., supra,* so that the reviewing court may properly determine whether the agency has acted lawfully and the parties will be informed of the grounds for the decision. *See also Barnes v. O'Berry Center,* 55 N.C. App. 244, 246-47, 284 S.E. 2d 716, 717-18 (1981) (Industrial Commission's findings too ambiguous to allow meaningful appellate review). Pursuant to this principle, the ordinance here requires the Council to make specific findings. That the Council made those findings using the language of the ordinance does not render them any less effective as findings. The findings required by the ordinance are sufficiently specific that the reviewing court can determine whether they are substantially supported by the record, and thus whether the decision is arbitrary. That is all that is required under current law. *See Kenan v. Board of Adjustment,* 13 N.C. App. 688, 187 S.E. 2d 496, *cert. denied,* 281 N.C. 314, 188 S.E. 2d 897 (1972) (Board of Adjustment tracked the language of the ordinance in denying a special use permit, finding three of four required findings insufficiently supported; Court was able to review denial on basis of such findings).

Petitioner contends that G.S. 150A-36 (1983) of the Administrative Procedure Act, although not applicable to municipalities, G.S. 150A-2(1) (1983), suggests that more specificity should be required of findings such as those here. Although the APA has been the source of general principles adopted by our Courts with respect to municipal actions, *see Concrete Co., supra,* 299 N.C. at 625, 265 S.E. 2d at 382, we do not believe it should be applied by analogy to require more detailed findings here.

Finally, petitioner makes bare, unsupported claims that it was denied the essentials of a fair trial, and that this denial, along with the preceding contentions, constituted arbitrary and capricious action and denial of due process by the Council. We find no merit to these contentions.

## VI.

[8] Petitioner argues that the superior court impermissibly substituted its own findings for those of the Council in affirming the approval of the permit application.

"The 'whole record' test does not allow the reviewing court to replace the [agency's] judgment as between two reasonably conflicting views, even though the court could justifiably have reached a different result had the matter been before it *de novo* . . . ." *Thompson v. Board of Education, supra,* 292 N.C. at 410, 233 S.E. 2d at 541. *See also, Concrete Co., supra,* 299 N.C. at 626, 265 S.E. 2d at 383.

The superior court did not substitute its judgment for the Council's, but merely made findings regarding the evidence in the record which, although at times contradictory, on the whole supported the Council's findings. Further, whether the superior court substituted its judgment for that of the Council could not be determinative of the review by this Court, for our task is to review the Council's action, not that of the superior court, and in doing so to address the full scope of considerations that also guided the superior court in its review. *See Concrete Co., supra,* 299 N.C. at 626-27, 265 S.E. 2d at 383.

Affirmed.

Judges WEBB and BRASWELL concur.