An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-316

Filed 5 November 2025

Buncombe County, No. 22 CVS 1457-100

KATHRYN A. HAYNER, HARRY T. JONES, III, WILLIAM P. JONES, MARGARET JONES BERRY, and NANCY JONES FOX, Petitioners,

v.

TOWN OF MONTREAT, NORTH CAROLINA and MOUNTAIN RETREAT ASSOCIATION, INC., Respondents.

Appeal by Respondent Mountain Retreat Association, Inc., from order entered 22 September 2023 by Judge Peter Knight in Buncombe County Superior Court. Heard in the Court of Appeals 23 October 2024.

*Robinson, Bradshaw, & Hinson, P.A., by Attorneys Stephen M. Cox, John R. Wester, and Garrett A. Steadman, for respondent-appellant Mountain Retreat Association, Inc.*

*McGuire, Wood & Bissette, by Attorney Robert W. Oast, Jr., for respondent-appellant Mountain Retreat Association.*

*The Brough Law Firm, PLLC, by Attorney T.C. Morphis, Jr., for respondent-appellant Mountain Retreat Association.*

*Roberts & Stevens, PA, by Attorneys John D. Noor and David C. Hawisher, for petitioners-appellees.*

STADING, Judge.

This appeal arises out of a dispute between several citizens of the Town of Montreat and Mountain Retreat Association, Inc. (the "MRA") with respect to the MRA's application for a special use permit ("SUP"). The Town's Board of Adjustment (the "Board" or "BOA"), in a quasi-judicial decision, granted the MRA's SUP application. Kathryn A. Hayner, Harry T. Jones, III, William P. Jones, Margaret Jones Berry, and Nancy Jones Fox (collectively, "Petitioners") petitioned the trial court for writ of certiorari ("PWC") to review the Board's decision, which was granted. On review, the trial court reversed the Board's decision. The MRA appealed the trial court's decision.

On appeal to our Court, the MRA asserts the trial court erroneously concluded that certain expert witness testimony was inadmissible under N.C. Gen. Stat. § 8C-1, Rule 702 (2023) and erroneously concluded that the Board's decision to grant the MRA's SUP application was not supported by substantial evidence. The MRA also asserts the trial court erred in concluding that the Board violated Petitioners' due process rights to an impartial quasi-judicial hearing. We also consider several of Petitioners' concerns raised on appeal. After careful review, we reverse the trial court's order.

## I.   Background

The MRA was established in 1897 in the Town of Montreat "to maintain . . . a municipality containing assembly grounds for the encouragement of Christian work and living[.]"  Until the Town's incorporation in 1967, the MRA provided "basic municipal services," including, but not limited to, water, electricity, roads, schools, etc.  After the Town's incorporation, the MRA maintained "significant open space and recreation resources that are open to the public."  To that end, the MRA "operates a lodge and conference center—including offices, meeting spaces, parking, and lodging rooms—on its property . . . located at 309 Collegiate Circle in the Town of Montreat." The purpose of both the MRA and the lodge "is to provide a place for the leadership of the Presbyterian Church USA and its members from around the country to assemble and pursue activities in furtherance of their ministry[.]"

In July 2021, the MRA applied to the Board, requesting an SUP "to expand and modernize [its] lodging facilities."  The expansion was "planned mostly for institutional uses and activities centered around the MRA," but also included the potential for "office, civic, residential, and service[ ] uses."  The proposed expansion included, inter alia, the replacement of existing structures; the construction of a new 29,000 square foot building with forty guest rooms, offices, and meeting spaces; and a thirty-space parking garage located under the building.

From October 2021 through January 2022, the Board conducted a hearing over several sessions to discern whether the MRA's application satisfied the Town's zoning

ordinances (the "MZO"). At these sessions, the Board received various forms of evidence, including the testimony of expert witnesses and a battery of different exhibits. Upon concluding its deliberations on 6 January 2022, the Board approved the MRA's SUP by a 5-2 vote.

On 24 March 2022, the Board entered an order, memorializing its decision to grant the MRA's SUP application. The order concluded the MRA's SUP application satisfied MZO §§ 107, 310.621–26, 310.634, 605, 606, 705:

> 2) The Applicant's application for the Special Use Permit is complete;
>
> 3) The Board has authority to modify applicable development standards pursuant to Section 310.622 of the Ordinance or to waive application of a development standard in certain Special Use Permits pursuant to Section 107 of the Ordinance. The requirements of Sections 605, 606 and 705 are modified to allow a hotel with one or more buildings and more than one principal building per lot or two accessory buildings per lot in a residential zoning district, as the case may be, and to allow perpendicular parking;
>
> 4) If completed as proposed in the application, and subject to the attached conditions, the Applicant's development does and will comply with all the requirements of the Ordinance as such regulations were modified by the Board;
>
> 5) The proposed use will not be detrimental to or endanger the public health, safety or general welfare if developed according to the submitted application;
>
> 6) The proposed use meets or will meet all required or applicable development standards and conditions of the Town, as such regulations have been modified by the Board;

7) The proposed use will not substantially diminish and impair the value of property, any portion of which is located within 250 feet from any boundary of the Subject Property;

8) The proposed use, if developed according to the application and site plan submitted, will be in harmony with the area and will not injure the existing use and enjoyment of other property in the area;

9) The proposed use, if developed according to the application and site plan submitted, will be in general conformity with the Comprehensive Plan of the Town and other adopted policies and plans;

10) Adequate measures have been taken for ingress and egress to the Subject Property so as to minimize congestion in the surrounding public streets; and

11) The application for a Special Use Permit submitted by the Applicant should be approved.

NOW, THEREFORE, IT IS ORDERED, based upon the foregoing Findings of Facts and Conclusions of Law, the Board hereby approves the application. . . .

Petitioners, who are property owners "immediately adjacent to the site of the proposed hotel," petitioned the trial court for certiorari to review the Board's decision. Petitioners asserted that: (1) the Board failed to determine contested facts; (2) MZO § 310.622 unlawfully delegated legislative authority to the Board; (3) the Board's decision is not supported by substantial evidence and therefore is arbitrary and capricious; and (4) the Board violated Petitioners' due process rights by failing to disclose certain ex parte communications and financial contributions. Petitioners maintained that the Board's decision "must be reversed" because it violated

Petitioners' due process rights, was in excess of the authority granted to the Board, was inconsistent with the MZO, was unsupported by substantial evidence, was arbitrary and capricious, and was otherwise affected by errors of law. The trial court granted Petitioners' PWC on 22 May 2022, and the matter was heard on 3 May 2023.

On 22 September 2023, the trial court ordered reversal of the Board's decision. The trial court concluded the Board violated Petitioners' due process rights, erroneously admitted the evidence of an expert traffic witness, and that the Board's decision to grant the SUP was not supported by substantial evidence:

> 30. Exercising *de novo* review, the undersigned concludes that the BOA erred as a matter of law by violating Petitioner's constitutional due process rights to an impartial decisionmaker when at least four (4) of the seven (7) members who participated in the quasi-judicial hearing were financial contributors to the applicant and did not disclose this information prior to participating in the hearing. The financial contributions evidenced . . . a close associational relationship between the contributing Board members and the MRA in violation of N.C. Gen. Stat. § 160D-109(d). Further, the testimony of the MRA president suggested that approval of the Hotel would support the operations of an organization that the contributing Board members had, and in some cases continued to, financially support.
>
> 31. Exercising *de novo* review, the undersigned concludes that the BOA erred as a matter of law in admitting the testimony of the MRA's traffic engineer which was not competent because, pursuant to N.C. Gen. Stat. § 160D-1402(j)(3)(b)–(c) it was testimony about matters to which only expert testimony would generally be admissible under the rules of evidence and the testimony did not comply with Rule 702. Additionally, the testimony was objected to and was not sufficiently trustworthy or admitted under such

circumstances that made it reasonable to be relied upon by the Board. N.C. Gen. Stat. § 160D-1402(j)(3).

. . . .

35. Reversal and remand is warranted in this case, pursuant to N.C. Gen. Stat. § 160D-1402(k)(3)(b), because the Board's decision was not supported by competent, material and substantial evidence and included the above-identified errors of law.

36. Even if the record was supported by competent, material, and substantial evidence and did not include the above-identified non-due process errors of law, the violation of Petitioners' due process right to an impartial decision maker would still require that decision be reversed.

The MRA timely entered its notice of appeal from this order on 18 October 2023.

## II. Jurisdiction

This matter is properly before this Court pursuant to N.C. Gen. Stat. § 7A-27(b)(1) (2023) (appeal of right "[f]rom any final judgment of a superior court . . . .").

## III. Analysis

The MRA challenges the trial court's order reversing the Board's grant of its SUP. In doing so, the MRA maintains the trial court committed error when it concluded the "charitable contributions made by [the Board's] members violated Petitioners' due process rights" pursuant to N.C. Gen. Stat. § 160D-109(d) (2023).[1]

---

[1] Petitioners and the Board both argue whether the donations created a financial interest in the outcome of the matter under subsection 160D-109(d). However, a close reading of the record reveals that Petitioners failed to make this argument in their PWC submitted to the trial court—it solely raised allegations of a close associational relationship and undisclosed ex parte communications.

The MRA further contends the trial court erred by concluding the Board improperly admitted expert testimony contrary to N.C. Gen. Stat. §§ 160D-1402(j)(3)(b)–(c) and 8C-1, Rule 702 (2023). Finally, the MRA argues the trial court's conclusion was in error because the Board's decision to grant their SUP application was supported by competent, material, and substantial evidence.

Petitioners raise several additional issues of their own. *See* N.C. R. App. P. 28(c) (2023). They assert several alternative grounds to support the trial court's order. Petitioners maintain the Board should have concluded that certain communications between Board Members and the MRA amounted to undisclosed ex parte communications in violation of subsection 160D-109(d), thereby infringing on their due process rights to an impartial decisionmaker; unlawfully modified certain sections of the MZO; and failed to resolve contested issues of fact.

When determining whether to grant an applicant's SUP, the Board "acts in a quasi-judicial capacity." *Humble Oil & Refin. Co. v. Bd. of Aldermen*, 284 N.C. 458, 469, 202 S.E.2d 129, 136–37 (1974). "Every quasi-judicial decision shall be subject to review by the superior court by proceedings in the nature of certiorari pursuant to G.S. 160D-1402." N.C. Gen. Stat. § 160D-406(k) (2023). The reviewing superior court

---

Thus, the trial court never had the opportunity to pass upon the issue and did not include any findings of fact or conclusions of law pertaining to an alleged financial interest in the outcome of the matter. We must therefore decline review of this issue. *See Rolan v. N.C. Dep't of Agric. & Consumer Servs.*, 233 N.C. App. 371, 381, 756 S.E.2d 788, 794 (2014) ("As a general rule, a party may not make one argument on an issue at the trial level and then make a new and different argument as to that same issue on appeal.").

"sits as an appellate court, and not as a trier of facts." *Tate Terrace Realty Invc., Inc. v. Currituck Cnty.*, 127 N.C. App. 212, 217, 488 S.E.2d 845, 848 (1997).  That said, "the task of a court reviewing a decision on an application for a [special] use permit made by a town board sitting as a quasi-judicial body" consists of:

> (1) Reviewing the record for errors in law,
>
> (2) Insuring that procedures specified by law in both statute and ordinance are followed,
>
> (3) Insuring that appropriate due process rights of a petitioner are protected including the right to offer evidence, cross-examine witnesses, and inspect documents,
>
> (4) Insuring that decisions of town boards are supported by competent, material and substantial evidence in the whole record, and
>
> (5) Insuring that decisions are not arbitrary and capricious.

*Coastal Ready-Mix Concrete Co. v. Bd. of Comm'rs*, 299 N.C. 620, 626, 265 S.E.2d 379, 383 (1980); *see also* N.C. Gen. Stat. § 160D-1402(j)(1)–(2).

"The standard of review of the superior court depends upon the purported error." *Little River, LLC v. Lee Cty.*, 257 N.C. App. 55, 59, 809 S.E.2d 42, 46 (2017) (citations omitted).  Indeed, when a party maintains a Board's decision was the result of an error of law, the reviewing court "shall review that issue de novo." *See* N.C. Gen. Stat. § 160D-1402(j)(2).

But "[w]hen the petitioner questions (1) whether the agency's decision was supported by the evidence or (2) whether the decision was arbitrary or capricious,

then the [superior] court must apply the 'whole record' test." *ACT-UP Triangle v. Comm'n for Health Servs.*, 345 N.C. 699, 706, 483 S.E.2d 388, 392 (1997) (cleaned up); *see also* N.C. Gen. Stat. § 160D-1402(j)(2). "The 'whole record' test requires the reviewing court to examine all competent evidence (the 'whole record') in order to determine whether the agency decision is supported by 'substantial evidence.'" *Id.* (quotation marks and citation omitted). "Substantial evidence has been defined to mean such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PHG Asheville, LLC v. City of Asheville*, 262 N.C. App. 231, 238, 822 S.E.2d 79, 84 (2018) (citation and quotation marks omitted). "When an applicant for a special use permit produces competent, material, substantial evidence that he has complied with the requirements of the ordinance, he makes a prima facie showing that he is entitled to the permit." *C.C. & J. Enters. v. City of Asheville,* 132 N.C. App. 550, 552, 512 S.E.2d 766, 769 (1999) (citation omitted). "After the prima facie showing, a denial of the permit must 'be based upon findings contra which are supported by competent, material, and substantial evidence appearing in the record.'" *Id.* (quoting *Humble Oil,* 284 N.C. at 468, 202 S.E.2d 129, 136).

In conducting a whole record review, "[t]he [trial] court should not replace the council's judgment as between two reasonably conflicting views[.]" *SBA, Inc. v. City of Asheville City Council*, 141 N.C. App. 19, 27, 539 S.E.2d 18, 22 (2002) (citations omitted). Additionally, "'while the record may contain evidence contrary to the findings of the agency, this Court may not substitute its judgment for that of the

agency." *Id.* (citations omitted). This Court "examines the trial court's order for error of law. The process has been described as a twofold task: (1) determining whether the trial court exercised the appropriate scope of review, and if appropriate, (2) deciding whether the court did so properly." *ACT-UP Triangle*, 345 N.C. at 706, 483 S.E.2d at 392 (quotation marks and citation omitted).

## A. Evidentiary Challenges

### 1. Expert Testimony—Traffic Engineer

The MRA asserts the trial court committed error by concluding that Jeffrey Moore's expert testimony concerning a traffic study was inadmissible under N.C. Gen. Stat. §§ 160D-1402(j)(3) and 8C-1, Rule 702. The MRA maintains Mr. Moore's traffic study was based upon sufficient facts or data, was the product of reliable principles and methods, and he applied those principles and methods reliably to the facts of the case.

The board of adjustment is a quasi-judicial body that is not bound by the rules of evidence or civil procedure. *See, e.g., Harding v. Bd. of Adjustment*, 170 N.C. App. 392, 397, 612 S.E.2d 431, 436 (2005); *Cook v. Union Cty. Zoning Bd. of Adjustment*, 185 N.C. App. 582, 594, 649 S.E.2d 458, 467–68 (2007); *Humble Oil*, 284 N.C. at 470, 202 S.E.2d at 137; *Burton v. New Hanover Cnty. Zoning Bd. of Adjustment, etc.*, 49 N.C. App. 439, 442–43, 271 S.E.2d 550, 552 (1980); *Jarrell v. Bd. of Adjustment*, 258 N.C. 476, 481, 128 S.E.2d 879, 883 (1963); *Robinhood Trails Neighbors v. Winston-Salem Zoning Bd. of Adjustment*, 44 N.C. App. 539, 542, 261 S.E.2d 520, 522 (1980);

*Hampton v. Cumberland Cnty.*, 256 N.C. App. 656, 670, 808 S.E.2d 763, 773 (2017).

Indeed, Chapter 160D confirms the Board *may* rely on evidence that would be inadmissible *under the Rules of Evidence* if one of two conditions are met:

> The term "competent evidence," as used in this subsection, *does not preclude reliance by the decision-making board on evidence that would not be admissible under the rules of evidence* as applied in the trial division of the General Court of Justice *if* (i) except for the items noted in sub-subdivisions a., b., and c. of this subdivision that are conclusively incompetent, the evidence was admitted without objection *or* (ii) the evidence appears to be sufficiently trustworthy and was admitted under such circumstances that it was reasonable for the decision-making board to rely upon it.

N.C. Gen. Stat. § 160D-1402(j)(3) (2023) (emphasis added). While the "technical legal rules of evidence and procedure may be disregarded, no essential element of a fair trial can be dispensed with. The party whose rights are being determined must be given the opportunity to cross-examine witnesses, inspect documents and offer evidence in explanation and rebuttal." *Jarrell*, 258 N.C. at 481, 128 S.E.2d at 883 (citation omitted).

Here, the trial court noted that at the hearing, Petitioners objected to the testimony of the traffic expert under Rule 702, arguing "the opinion was not based on sufficient facts and was based on an unreliable methodology." The trial court found:

> As for the data relied upon by Mr. Moore, it was disclosed that [he] (1) relied exclusively on the verbal representations of the applicant for the data supporting his opinion, . . . (2) admitted that the applicant had a "financial interest" in the outcome of his work and was not a source

of "independent unbiased data," . . . and (3) did not properly investigate or verify the data provided by the applicant and on which he based his opinion.

With respect to methodology, the trial court found Mr. Moore's opinion "was an estimation that he crafted for the purposes of this case . . . ."

Based on its findings, the trial court concluded that Mr. Moore's testimony failed to comport with subsections 160D-1402(j)(3)(b)–(c) and Rule 702(a)(1)–(3):

> 31. Exercising *de novo* review, the undersigned concludes that the BOA erred as a matter in admitting the testimony of the MRA's traffic engineer which was not competent because, pursuant to N.C. Gen. Stat. § 160D-1402(j)(3)(b)–(c) it was testimony about matters to which only expert testimony would generally be admissible under the rules of evidence and the testimony did not comply with Rule 702. Additionally, the testimony was objected to and was not sufficiently trustworthy or admitted under such circumstances that made it reasonable to be relied upon by the Board. N.C. Gen. Stat. § 160D-1402(j)(3).

Subsection 160D-1402(j)(3) specifically outlines the superior court's "[s]cope of review" when evaluating the competency of evidence offered at the hearing. Under this subsection, the Board may consider evidence otherwise inadmissible under the rules of evidence if:

> (i). . . the evidence was admitted without objection or (ii) the evidence appears to be sufficiently trustworthy and was admitted under such circumstances that it was reasonable for the decision-making board to rely upon it.

The term "competent evidence," however, *does not* include the "opinion testimony of *lay witnesses*" as to any of the following:

a. The use of property in a particular way affects the value of other property.

b. The increase in vehicular traffic resulting from a proposed development poses a danger to the public safety.

c. Matters about which only expert testimony would generally be admissible under the rules of evidence.

N.C. Gen. Stat. § 160D-1402(j)(3)(a)–(c) (emphasis added).

The trial court's order misapplies the statutory exclusions of lay opinion testimony to the expert testimony challenged on appeal. *See id.* § 160D-1402(j)(3)(c); *see also PHG Asheville, LLC v. City of Asheville*, 374 N.C. 133, 156, 839 S.E.2d 755, 770 (2020) (citing N.C. Gen. Stat. § 160A-393(k)(3)(b) (2019)); *see also Humble Oil*, 284 N.C. at 469, 202 S.E.2d at 136; *see also Sun Suites Holdings, L.L.C. v. Bd. of Aldermen of Garner*, 139 N.C. App. 269, 278, 533 S.E.2d 525, 531 (2000). The question in this case is not whether Mr. Moore was properly tendered as an expert in traffic engineering and management; it is whether his *methodology and opinions* were sufficient to qualify as competent evidence under subsection 160D-1402.[2]

Indeed, subsection 160D-1402(j)(3)(b)–(c) expressly provides that a lay witness may not testify about matters pertaining to an increase in vehicular traffic as a result of a proposed development, or about matters in which an expert is ordinarily required under the rules of evidence. That said, an expert witness may be "qualified by virtue

---

[2] A footnote in Petitioner's brief concedes, "Mr. Moore was qualified as an expert without objection, but Petitioners objected to his testimony as unreliable and moved to strike it on that basis."

of his profession . . . ." *Sun Suites Holdings*, 139 N.C. App. at 278, 533 S.E.2d at 531. But professional experience is not enough—the expert's testimony must also be supported "by factual data or background[.]" *Humble Oil*, 284 N.C. at 469, 202 S.E.2d at 136; *see also Sun Suites Holdings*, 139 N.C. App. at 278, 533 S.E.2d at 531; *see also Piney Mt. Neighborhood Assoc. v. Town of Chapel Hill*, 63 N.C. App. 244, 253, 304 S.E.2d 251, 256 (1983) ("[C]onclusions unsupported by factual data or background, are incompetent and insufficient to support the [Board's] findings.").

Here, Mr. Moore testified as an expert witness in traffic engineering and management. Mr. Moore, a twenty-one-year-career traffic and highway maintenance engineer, qualified as an expert. He received a degree in civil engineering, worked in the military as a combat engineer, completed "NCDOT Congestion Management Side Development Highway Access Training," and maintained his license as a professional engineer in North Carolina, South Carolina, Georgia, and Florida. Considering Mr. Moore's background and profession, the exclusions contained within subsection 160D-1402(j)(3)(c) applicable to *lay* witnesses, are inapplicable. Moreover, Mr. Moore's testimony was supported by factual data derived from a traffic impact study. And Mr. Moore directly testified to the fact that the methodology he used in this study was verified by other engineers within his firm, and that it is "not routine" for the methodology to be reviewed by outside engineering firms.

The evidence offered by the expert witness "appears to be sufficiently trustworthy and was admitted under such circumstances that it was reasonable for

the decision-making board to rely upon it[.]" *See id.* § 160D-1402(j)(3). Further, the trial court did not disregard any of the essential elements of a fair trial. *See Jarrell*, 258 N.C. at 481, 128 S.E.2d at 883. Our review of the transcript reveals that Petitioners were allowed to cross-examine Mr. Moore, inspect his documents, and offer evidence in explanation and rebuttal. *See id.* Accordingly, the trial court committed error by concluding that Mr. Moore's expert witness testimony was inadmissible under N.C. Gen. Stat. §§ 160D-1402(j) and 8C-1, Rule 702.

### 2. *Substantial Evidence*

The MRA next asserts the trial court erred in concluding the MRA's SUP application was not supported by substantial evidence. The MRA maintains the trial court "did not offer any support for its conclusion," and there was substantial evidence satisfying the traffic impact standard of its SUP application.

The trial court's order reversing the grant of the SUP to the MRA is silent as to which "application requirements" the MRA failed to satisfy. The trial court's order merely concludes: "Reversal and remand to the BOA is warranted in this case, pursuant to N.C. Gen. Stat. § 160D-1402(k)(3)(b), because the Board's decisions was not supported by competent, material and substantial evidence and included the above-identified errors of law."[3] On appeal, the only contested evidence relied on by

---

[3] The "above-identified errors of law" language refers to the admission of Mr. Moore's testimony addressed in subsection A.1., and the due process challenge addressed in section B.

the Board was the expert testimony of Jeffrey Moore. But we have already concluded

the trial court erroneously determined this evidence was inadmissible.

Our review of the evidentiary record and the trial court's order leads us to

conclude the evidence presented to the Board was sufficient for their determination

to award the SUP to the MRA. The MZO provides six express criteria for all special

uses; Petitioners only contested three criteria before the Board:

> 310.621 That the Use will not be detrimental to or
> endanger the public health, safety or general welfare if
> located where proposed and developed according to the
> plan as submitted and approved;
>
> 310.622 That the Use meets or will meet all the required
> and applicable development standards and conditions of
> the Town of Montreat (including, without limitation all
> development standards, conditions, and requirements
> related to utilities, parking, access, and stormwater
> drainage and the applicable regulations of the Zoning
> District in which it is located, except as such regulations
> may, for each case, be modified by the Board of
> Adjustment);
>
> 310.623 That the Use will not substantially diminish and
> impair the value of any property any portion of which is
> located within two hundred fifty feet (250') of the boundary
> of the parcel on which the Use will be located;

MZO § 310.621–63 (2021) ("Procedures for Special Use Permits Approved by the

Board of Adjustment."); *see also 85' & Sunny, LCC v. Currituck Cnty.*, 279 N.C. App.

1, 12, 864 S.E.2d 742, 749 (2021) (citing *Church v. Bemis Mfg. Co.*, 228 N.C. App. 23,

26, 742 S.E.2d 680, 682 (2013)) ("The Board found that these site plans were used

until 2018 'to direct customers to campsite locations,' a finding that is not specifically challenged by Petitioner and is therefore binding on appeal.").

The Board concluded the MRA satisfied all six criteria, and noted "[n]o competent, material and substantial evidence was presented by the opposition" against the competent evidence offered by the MRA under MZO §§ 310.624–26. *See, e.g., Schooldev E., LLC v. Town of Wake Forest*, 386 N.C. 775, 795, 909 S.E.2d 181, 196 (2024) (first quoting *PHG Asheville*, 374 N.C. at 149, 839 S.E.2d at 766) (then quoting *Humble Oil*, 284 N.C. at 468, 202 S.E.2d at 136) ("If this prima facie case is established, the agency may only deny the application 'based upon findings contra which are supported by competent, material, and substantial evidence appearing in the record.'"). In reviewing the trial court's order, we must consider whether substantial evidence supports the three challenged requirements. N.C. Gen. Stat. § 160D-1402(j).

With respect to subsection 310.621, there is competent evidence that the MRA's use of the subject property will not "be detrimental to or endanger the public health, safety or general welfare[.]" At the hearing, Charles Krekelberg, a senior project manager with Samsel architects, testified as an expert witness in site design and development code compliance. Mr. Krekelberg testified that "the proposed use" by the MRA would not "endanger public health, safety or general welfare, the proposed use would be in harmony with the area and is designed to minimize congestion on surrounding streets." He noted that in working on this project, he

considered the zoning ordinance, the parking application, the building height, the building massing, the building volume, the building footprint, and the surrounding existing structures. He added that the design accounted for the existing historical structures throughout the Town and is specially placed on the subject property "to minimize the effect on adjoining property owners' views." Additionally, Mr. Moore noted that the subject property was designed to "minimize congestion in the public streets and that the proposed traffic design will not be detrimental" to the public. He concluded, the use would not be detrimental to or endanger the public health, safety, or general welfare, satisfying the standard in MZO subsection 310.621. Further, Nathan Bryant, an expert in architecture and building design, testified the use "will not be detrimental to or endanger the public health, safety or general welfare" because the building complies with setbacks and structure height, and maximizes green space.

Competent evidence also supports the requirements of subsection 310.622, that the use "meets or will meet all the required and applicable development standards and conditions of the Town of Montreat[.]" John Kinnaird, an expert witness in civil engineering and site design, testified to the subject property's ability to comply with development standards, including stormwater management, soil erosion and sedimentation control. Additionally, David Scott Schuford, an expert in municipal planning, testified to the Project's compliance as the site plan is consistent

with the MZO and the Town's comprehensive plan. He specifically opined as to "the bulk, mass and scale of surrounding uses and/or the design and style of such uses."

Lastly, competent evidence supports MZO § 310.623 that the use "will not substantially diminish and impair the value of any property any portion of which is located within two hundred fifty feet" of the boundary of the subject parcel. John Palmer, an expert in land and property valuation, "testified about comparable property with similar conference center uses in close proximity." Mr. Palmer explained, "based upon his study the proposed use of the Subject Property will not substantially diminish or impact the value of any property which is located within 250 feet of the Subject Property."

The foregoing evidence highlights there was competent evidence to support the Board's granting of the MRA's SUP. *See PHG Asheville, LLC*, 374 N.C. at 149, 839 S.E.2d at 765–66 (cleaned up) ("The local governmental body must determine whether 'an applicant has produced competent, material, and substantial evidence *tending to establish* the existence of the facts and conditions which the ordinance requires for the issuance of a [special] use permit. In the event that the applicant satisfies this initial burden of production, then '*prima facie* he is entitled to' the issuance of the requested permit."*)*. We hold although the trial court exercised the appropriate standards of review in considering Petitioners' PWC, and although there is evidence which could support findings to the contrary, the trial court erred by replacing the Board's judgment with its own. *85' & Sunny,* 279 N.C. App. at 10, 864

S.E.2d at 748 (citing *Mann Media, Inc. v. Randolph Cnty. Planning Bd.,* 356 N.C. 1, 14, 565 S.E.2d 9, 17–18 (2002)) ("The 'whole record' test does not allow the reviewing court to replace the board's judgment as between two reasonably conflicting views, even though the court could justifiably have reached a different result had the matter been before it de novo."). Accordingly, the trial court incorrectly applied the whole record test to the issue of whether the MRA had met its evidentiary burden. *See ACT-UP Triangle*, 345 N.C. at 706, 483 S.E.2d at 392.

## B. Constitutional Challenges

### 1. Due Process

The MRA asserts the trial court erred by concluding the Board's decision violated Petitioners' due process rights. It maintains that the various financial contributions by Board members to the MRA did not create a close associational relationship as defined under N.C. Gen. Stat. § 160D-109(d).[4] Our review of the record reveals that although the trial court applied the appropriate standard of review, de novo, when addressing this alleged error, we are bound to disagree with

---

[4] The MRA raises several additional arguments on appeal: (1) no evidence demonstrates that the charitable contributions made by the Board members to the MRA gave those board members a financial interest in the outcome of the MRA's SUP application; (2) none of the Board members had a disqualifying bias in the outcome of the MRA's SUP application; and (3) a majority of the Board members who did not make contributions to the MRA still voted to approve the SUP. A close reading of the trial court's order reveals that it did not conclude the donating Board members had a financial interest in the outcome of the MRA's SUP application—nor did it conclude that any other disqualifying biases applied. It merely concluded, "[t]he financial contributions evidence, among other things, a close associational relationship between the contributing Board members and the MRA in violation of N.C. Gen. Stat. § 160D-109(d)."

its conclusion pertaining to whether members of the Board had a close associational relationship with the MRA. *See ACT-UP Triangle*, 345 N.C. at 706, 483 S.E.2d at 392. Notwithstanding, we agree with the trial court insofar as it concluded the financial contributions did not create a financial interest in the outcome of the matter, and the undisclosed ex parte communications did not violate subsection 160D-109(d).

Chapter 160D of the North Carolina General Statutes concerns local planning and development regulation. *See* N.C. Gen. Stat. § 160D-101 *et seq.* (2023). In particular, subsection 160D-109(d) provides, "[a] member of any board exercising quasi-judicial functions . . . *shall not participate in or vote* on any quasi-judicial matter in a manner that would violate affected persons' constitutional rights to an impartial decision maker." *Id.* § 160D-109(d) (emphasis added). Subsection 160D-109(d) enumerates several violations of due process, including: "a member having a fixed opinion prior to hearing the matter that is not susceptible to change, undisclosed ex parte communications, *a close familial, business, or other associational relationship with an affected person*, or *a financial interest in the outcome of the matter*." *Id.* (emphasis added). That said, section 160D-109 only defines "close familial relationship," leaving "close associational relationship" and "undisclosed ex parte communication" undefined.[5] *Id.* § 160D-109(d)–(f).

Consistent with subsection 160D-109(d), our common law provides that a

---

[5]Under N.C. Gen. Stat. § 160D-109(f), a "'close familial relationship' means a spouse, parent, child, brother, sister, grandparent, or grandchild. The term includes the step, half, and in-law relationships."

quasi-judicial actor should not "act on a matter affecting the public when he has a direct pecuniary interest . . . ." *Cnty. of Lancaster v. Mecklenburg Cnty.*, 334 N.C. 496, 511 n.8, 434 S.E.2d 604, 614 (1993) (quoting *Kendall v. Stafford*, 178 N.C. 461, 464, 101 S.E. 15, 16 (1919)). Indeed, "[g]overning bodies sitting in a quasi-judicial capacity are performing as judges and must be neutral, impartial, and base their decisions solely upon the evidence submitted." *PHG Asheville*, 262 N.C. App. at 239, 822 S.E.2d at 85. "[T]here is a 'presumption of honesty and integrity in those serving as adjudicator' on a quasi-judicial tribunal. A party claiming bias or prejudice may move for recusal and in such event has the burden of demonstrating objectively that grounds for disqualification actually exist." *In re N. Wilkesboro Speedway, Inc.*, 158 N.C. App. 669, 675–76, 582 S.E.2d 39, 43 (2003) (citations and quotation marks omitted)

### a. Close Associational Relationship

Exercising de novo review, the trial court concluded that the Board violated Petitioners' constitutional due process rights to an impartial decision maker since several board members made monetary contributions to the MRA, thus creating a close associational relationship in violation of subsection 160D-109(d):

> Exercising *de novo* review, the undersigned concludes that the BOA erred as a matter of law by violating Petitioner's constitutional due process rights to an impartial decisionmaker when at least four (4) of the seven (7) members who participated in the quasi-judicial hearing were financial contributors to the applicant and did not disclose this information prior to participating in the

hearing. The financial contributions evidenced . . . a close associational relationship between the contributing Board members and the MRA in violation of N.C. Gen. Stat. § 160D-109(d).

The monetary contributions in question consisted of the following donations by four

Board members:

    a. Board Member 1 made annual contributions to the MRA from 2005 through 2022 in an amount in excess of $355,000.00; [ ]

    b. Board Member 2 contributed $250.00 from 2018–20; [ ]

    c. Board Member 3 contributed $2,000.00 from 2003–04; [ ] and

    d. Board Member 4 contributed $30,760.00 from 1997 through 2021. [ ]

At the outset of the hearing, the Board's attorney asked whether "anybody ha[d] a close financial interest in the outcome of th[e] hearing such that [they] would benefit if it's either approved or denied[.]" The Board's attorney also asked whether any Board members had a "familial or a family relationship with anybody, the Applicant and/or the three parties that [were] approved for standing[.]" The Board members gave a negative response to both of the questions.

What constitutes a close associational relationship under subsection 160D-109(d) is a question of first impression. *See, e.g., Hagerman v. Union Cnty. Bd. Of Adjustment*, 258 N.C. App. 564, 811 S.E.2d 242 (2018) (unpublished) (addressing whether certain ex parte communications amounted to a violation of Petitioners' due process rights); *see also, e.g., Harbor Baptist Church v. City of Charlotte*, 2010 N.C.

App. LEXIS 1483 at *8 (2010) (unpublished) ("[W]hen the board members discussed whether Mr. Davis should recuse himself from the board for this case, they did so in consideration of all of Mr. Davis's disclosures leading up to the objection -- both the *ex parte* communications and the working relationship with Mr. Ashendorf.").

Chapter 160D does not define "close associational relationship," we thus begin by ascertaining its plain meaning. *Four Seasons Mgmt. Servs. v. Town of Wrightsville Beach*, 205 N.C. App. 65, 76–77, 695 S.E.2d 456, 463–64 (2010); *see also* N.C. Gen. Stat. § 160D-102 ("Definitions"). Our analysis begins with the principles of statutory construction in mind:

> The goal of statutory construction is to carry out the intent of the legislature. *Wynn v. Frederick*, 385 N.C. 576, 581, 895 S.E.2d 371 (2023). When construing a statute, we first examine "the plain words of the statute" because the text of the statute is "the best indicia of legislative intent." *Id.* (cleaned up). "If the plain language of the statute is unambiguous, we apply the statute as written." *Id.* (cleaned up). "If the plain language of the statute is ambiguous, however, we then look to other methods of statutory construction such as the broader statutory context, the structure of the statute, and certain canons of statutory construction to ascertain the legislature's intent." *Id.* (cleaned up).

*Sturdivant v. N.C. Dep't of Pub. Safety,* 386 N.C. 939, 944, 909 S.E.2d 483, 488 (2024).

"Typically, where the plain language of a statute is equally susceptible of multiple interpretations, we must attempt to discern the legislative intent behind the words in order to interpret the statute." *Winkler v. N.C. State Bd. of Plumbing*, 374 N.C. 726, 732, 843 S.E.2d 206, 212 (2020). "[W]hen considering the plain meaning

and text of a statute, it is appropriate to review dictionary definitions and meanings of undefined terms in the statute." *N.C. Ins. Guar. Ass'n v. Weathersfield Mgmt., LLC*, 268 N.C. App. 198, 204, 836 S.E.2d 754, 759 (2019).

As written in subsection 160D-109(d), the adjective "close" modifies "associational relationship."[6] *See* N.C. Gen. Stat. § 160D-109(d) (emphasis added) ("Impermissible violations of due process include . . . *a close* familial, business, *or other associational relationship* with an affected person[.]"); *see also Raleigh Hous. Auth. v. Winston*, 376 N.C. 790, 795, 855 S.E.2d 209, 213 (2021); *see also Steiner v. Windrow Estates Home Owners Ass'n*, 213 N.C. App. 454, 462, 713 S.E.2d 518, 524 (2011). Close, an adjective, is defined as "being near in time, space, effect, or degree." *Close*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/close (last visited 18 September 2025). Associational is "of, relating to, or characterized by association." Bryan A. Garner, Garner's Modern English Usage 96 (5th ed. 2022). Association is defined as "[a] gathering of people for a common purpose; the persons so joined." *Association,* Black's Law Dictionary. A "*relationship* refers either to kinship or to the fact of being related by some specific bond, especially a social or emotional bond." Garner, *supra*, at 940. It also has been defined as the

---

[6] We perceive the General Assembly purposely included "close" in the text of N.C. Gen. Stat. § 160D-109(d). *See United States v. Suncar*, 142 F.4th 259, 265 (4th Cir. 2025) (citation omitted) ("After all, we 'assume that the legislature used words that meant what it intended' and 'that all words had a purpose and were meant to be read consistently.'").

"way in which two people or two groups feel about each other and behave toward each other," or the "nature of the association between two or more people." *Relationship*, Black's Law Dictionary (12th ed. 2024). Considering the foregoing, a "close associational relationship," exists among those sharing a specific bond, by a close degree, for a common purpose.

Applying this definition, we hold the trial court erroneously concluded that these monetary contributions—*without additional evidence*—created an impermissible close associational relationship under subsection 160D-109(d). Although Board members donating money to the MRA may indicate a connection to the organization, the evidentiary record does not demonstrate a *close associational relationship* between these actors; the record merely evidences a history of donations by certain Board members to the MRA. The record does not contain information beyond specific dollar amounts listed in lump sums over a span of years. Without additional evidence establishing a *close associational relationship* between Board members and the MRA, we cannot draw the same conclusion as the trial court. *Cf. United States v. Werner*, 916 F.2d 175, 178–79 (4th Cir. 1990) ("Nash, as mayor of Harpers Ferry, had secured funds from the National Park Service for various town projects and was attempting to obtain funding for an additional project at the time the land commission was appointed. This factor, together with his past donations to the Park Service, the flagpole and commemorative plaque erected by the Park Service in his honor, his active participation in the Harpers Ferry Historical Association,

- 27 -

and his affidavit in opposition to his disqualification raise sufficient questions about his objectivity so that a disinterested observer could reasonably question his impartiality.").

### b. Ex Parte Communications

We also consider Petitioner's argument that the trial court incorrectly concluded certain undisclosed communications between Board members and the MRA did not violate Petitioners' due process rights under subsection 160D-109(d). Petitioners maintain that certain board members "had undisclosed ex parte communications with [the] MRA . . . and those communications show actual bias."[7] *See* N.C. R. App. P. 28(c) ("Without taking an appeal, an appellee may present issues on appeal based on any action or omission of the trial court that deprived the appellee of an alternative basis in law for supporting the judgment, order, or other determination from which appeal has been taken."); *see also, e.g., Singleton v. N.C. HHS*, 284 N.C. App. 104, 108, 874 S.E.2d 669, 673 (2022).

With respect to undisclosed ex parte communications, the trial court concluded that an email between the MRA's president and a Board member did not violate

---

[7] Petitioner also contends "[t]he Board purported to modify zoning provisions based on an invalid delegation of legislative authority." We decline to address this argument since it falls outside the ambit of N.C. R. App. P. 28(c). *See Singleton v. N.C. HHS*, 284 N.C. App. 104, 108, 874 S.E.2d 669, 673 (2022) (citation omitted) ("Defendants were not required to take a cross-appeal of the trial court's order dismissing the case under Rule 12(b)(6) in order to raise arguments under Rule 12(b)(1). Defendants' subject matter jurisdiction arguments fall under N.C. R. App. P. 28(c): "Without taking an appeal, an appellee may present issues on appeal based on any action or omission of the trial court that deprived the appellee of an alternative basis in law for supporting the judgment . . . from which appeal has been taken.").

subsection 160D-109(d):

> Exercising de novo review, the undersigned concludes that the BOA did not err as a matter of law, no conflict of interest was created, and the Petitioners' due process rights were not violated, by the email communication of one BOA member with the MRA's president in advance of the MRA's filing of the Application. BOA members should avoid any such communications at any time, and if such a communication does occur it should be disclosed when relevant to a matter before the Board.

The trial court also concluded that no violation of subsection 160D-109(d) occurred when the MRA's president called several Board members following the Board's approval of the MRA's SUP:

> Exercising de novo review, the undersigned concludes that no conflict of interest was created and the Petitioners' due process rights were not violated by the President of the MRA telephoning members of the BOA after the hearing and following the Board's approval of the Application.

We recognize an undisclosed ex parte communication could evidence an impermissible bias of a board member. *See PHG Asheville,* 262 N.C. App. at 240, 822 S.E.2d at 85 ("In quasi-judicial proceedings, no board or council member should appear to be an advocate for nor adopt an adversarial position to a party . . . or rely upon *ex parte* communications when making their decision."). Indeed, N.C. Gen. Stat. § 160D-109(d) enumerates violations of due process, including "undisclosed ex parte communications." That said, before an application is submitted, there are not yet pending or ongoing proceedings, and there are not yet litigants—parties to a lawsuit. *See Litigant*, Black's Law Dictionary ("A party to a lawsuit; the plaintiff or defendant

in a court action, whether an individual, firm, corporation, or other entity."); *see also Communication,* Black's Law Dictionary ("-ex parte communication (1804) A communication between counsel or a party and the court when opposing counsel or party is not present."); *see also Hagerman*, 258 N.C. App. 564, 811 S.E.2d 242 (Addressing undisclosed ex parte communications where the first undisclosed communication occurred while the proceeding was pending, and the second occurred while it was ongoing); *see also, e.g., Farber v. N.C. Psychology Bd.*, 153 N.C. App. 1, 7–8, 569 S.E.2d 287, 293 (2002) (Under Chapter 150B, "a member of an agency assigned to make a decision or to make findings of fact and conclusions of law in a contested case . . . shall not communicate, directly or indirectly, in connection with any issue of fact or question of law, with any person or party or his representative, except on notice and opportunity for all parties to participate. *This prohibition begins at the time of the notice of hearing*."); *see also Koch v. S.E.C.*, 48 F. App'x 778, 785 (Fed. Cir. 2002) (citation omitted) ("An *ex parte* communication with a Board adjudicative officer is defined as 'an oral or written communication between a decision-making official of the Board and an interested party to a proceeding, when that communication is made without providing the other parties to the appeal with a chance to participate.'"). That said, if a communication between a board member and a potential party is challenged as an ex parte communication, whether the failure to disclose that communication at the hearing constitutes a violation of due process turns on a showing of bias or prejudice. *See JWL Invests., Inc.*, 133 N.C. App. at 430,

515 S.E.2d at 718.

Here, the contested email communication occurred approximately four months *before* the MRA submitted its SUP application. The email contained a message from the MRA's president discussing the proposed lodge and site selection. In its order, the trial court found the email was "presumably sent to numerous recipients and did not solicit a response":

> On March 19, 2021, Ms. Chastain received a blast email from the MRA's president in which he discussed the proposed Lodge and its site election. [ ] While this email was presumably sent to numerous recipients and did not solicit a response, Board Member Chastain replied with
>
> Go for it! Do what you need to do to stay viable and competitive!
> Martha Chastain

Similarly, the phone calls from the MRA's president to several Board members occurred *after* the Board finalized its proceedings and voted to approve the SUP. The trial court's order concluded, "Petitioners' due process rights were not violated by the President of [the] MRA telephoning members of the BOA *after the hearing and following the Board's approval of the Application.*" Since these communications occurred outside the temporal window of ex parte communications, we hold the trial court properly concluded the Board did not violate subsection 160D-109(d).

Next, although both the email and phone calls do not constitute an ex parte communication, Petitioners maintain these communications "show actual bias." "Due process of law requires notice and the right to be heard before an unbiased and

impartial decision maker." *In re Application Raleigh*, 107 N.C. App. 505, 513, 421 S.E.2d 179, 184 (1992) (citing *Crump v. Bd. of Educ. of Hickory Admin. Sch. Unit*, 362 N.C. 603, 392 S.E.2d 579 (1990)). However, "[t]he distinction between pre-hearing knowledge and bias is key." *In re Application Raleigh*, 107 N.C. App. at 514, 421 S.E.2d at 184. "The mere fact that a decision maker enters a hearing with knowledge of the subject matter of the hearing does not lead necessarily to the conclusion that the decision maker's mind is closed to evidence and set as to the final result." *Id.*

"Bias has been defined as 'a predisposition to decide a cause or an issue in a certain way, which does not leave the mind perfectly open to conviction,' or as 'a sort of emotion constituting untrustworthy partiality.'" *Id.* at 513–14, 421 S.E.2d at 184. That said, "'[s]ome sort of commitment is necessary for disqualification [due to bias], even though it is less than an irrevocable one.' Bias can refer to preconceptions about facts, policy or law; a person, group or object; or a personal interest in the outcome of some determination." *Id.* (second alteration in original).

The "blast email" in question from the MRA's president was as follows:

> Over the last two weeks I've described a proposed new project in Montreat to construct modern lodging on the conference center campus, and I've made the case for its need. This week I want to tackle the question that has become the focus of discussion and contention: How did the conference center board select the proposed site for construction?
>
> Having investigated the possibility of renovating one or

more of our existing lodges without success, we began to look at the promise of new construction. The thought of a new building was daunting in one sense; the conference center has not constructed a new building of significant size in thirty years. Yet the opportunity to build new — rather than retrofit to accommodate the outdated — presented substantial advantages in design, cost savings, and much easier path to maintain compliance with modern building code.

The goals would remain the same: 1) a convenient location; 2) accessibility, particularly for older guests; and 3) privacy, in the form of private bathrooms. In particular, we greatly prioritized the goal of building in the center of town. With this in mind we considered our options:

Undeveloped land: One idea would be to build on one of the few remaining undeveloped parcels of land the conference center owns. Three of those options—land off Harmony Road, above Kentucky Road, and at the Lookout Road/Oklahoma Road intersection—were quickly discarded. The land in these areas is neither centrally located nor supported by any infrastructure. The fourth parcel sits across the street and up the hill from McAllister Gymnasium on Assembly Circle; it received consideration, but was also judged less than ideal for a host of reasons.

Acquisition: A second option would be to acquire a site, but the choices here were unattractive as well. First, options are greatly limited. Other institutional property in Montreat either wouldn't be suitable, isn't for sale, or both. Importantly, we recognize that our institutional partners all operate in the valley as distinct and important ministries of their own. We collaborate in many mutually beneficial ways, and changes in property ownership between us must serve the interest of both participating institutions. Such an opportunity that meets the goals of our search just doesn't exist right now.

Campus redevelopment: In early discussions the staff resuscitated the 1993 plan to build an additional wing onto

Assembly Inn, but this idea was quickly dismissed. Occupancy and revenue from the Inn's recent renovation were still growing. Adding a new wing of rooms and facilities would create a significant disruption in that progress, and would do nothing to provide enhanced accommodations for groups seeking a Montreat lodge experience.

Our search did, however, reveal one attractive option, as attention focused increasingly on two acres of our campus right in the middle of town.

The property contains six lodges. The three to the west—Reynolds, Hickory, and Walnut—have all been recently renovated and are in good shape. The other three, however—Galax, Chestnut, and the Lord Apartments—each have their challenges:

- Galax once served as a home for the conference center president, but it has not served as such since 2007. For the past fourteen years Galax has been a three-bedroom lodge used mostly to host conference leadership and families by night and for special events and meeting space for larger gatherings by day.

- Chestnut lodge serves the hardy church groups in the summer who find its close quarters very charming. For most others, Chestnut's charms prove rather elusive.

- Lord Apartments is used mainly to house mission volunteers. The air is moist, even for Montreat, courtesy of a tiny spring which trickles up from the ground under the building.

Contractors have judged that neither Chestnut nor Lord can be renovated in ways that will return a meaningful investment and the three buildings together only house 34 people in 17 bedrooms combined. The site itself, on the other hand, offers enormous potential:

- The property is buildable. (One prospective architect walking the property judged it "a flat site." Questioned

on that perspective, he replied, "In Western North Carolina, this is a flat site.")

- Its central location provides guests easy walking distance access to Anderson Auditorium and all of our primary program spaces as well as arts and recreation activities at Robert Lake Park and Bill Wilde Youth Center, Lake Susan, the Currie Craft Center, the Barn, Dowd Green, and Welch Field.

- The property is already used for the lodging of our guests, and the new lodge would reside alongside three neighboring lodges. There would be no change in use of the property, an important factor in any zoning or permitting discussion.

- Replacing Galax, Chestnut, and Lord would solve the expensive headache of maintaining three older, outdated lodges. Instead, a newly designed lodge could address parking, noise, and other issues that have prompted neighbor complaints with the existing lodges.

**In a nutshell, our board and staff concluded that the site in question is an underutilized asset of our campus and the best choice to pursue our hospitality, programmatic, and financial goals for our mission and ministry.**

And that's what we still think. At its meeting this week, our board members carefully reviewed in detail the process by which the site selection had been made. They also scrutinized the staff's earlier decision not to advance the idea of building a new wing onto Assembly Inn. After extensive discussion, the board left its current plans in place. In addition, board members directed that the schematic design period be extended to allow for additional input from neighbors and appointed a task force to converse with neighbors directly on the board's behalf. The board also pledged to invest in expertise to mitigate concerns about traffic, noise, and the environment. (You may read **the letter summarizing the board's**

**conclusions and invitation to neighbors here.)**
Finally, the task force set up a dedicated email address —
[ ] — to receive and curate public comment.

This adds some detail to our ongoing discussion about how
the lodge fits into the conference center's vision going
forward, but where does that vision align with the larger
trajectories of the church and the town that we serve? Next
week, I'll attempt to address some of those questions, so . . .
More to come!

Richard Dubose
President
Montreat Conference Center

In view of the email's content, the reply does not indicate a "commitment" to

decide the cause a certain way. *In re Application Raleigh*, 107 N.C. App. at 513–14,

421 S.E.2d at 184 ((citations and quotation marks omitted) (alteration in original)

("Bias has been defined as a predisposition to decide a cause or an issue in a certain

way, which does not leave the mind perfectly open to conviction, or as a sort of emotion

constituting untrustworthy partiality. Some sort of commitment is necessary for

disqualification [due to bias], even though it is less than an irrevocable one.").

Further, the President's email does not specifically seek a Board Member's support

or commitment to a decision. Nor does the email reference the need for a special use

permit. Board Member Chastain did not possess "special knowledge" that was

required to be "revealed at the public hearing[.]" *Humble Oil*, 284 N.C. at 468, 202

S.E.2d at 136. From this email, recipients merely possessed "pre-hearing knowledge"

that the MRA was contemplating replacing its facilities. *In re Application Raleigh*,

107 N.C. App. at 514, 421 S.E.2d at 184.

Absent a showing of bias or prejudice, we hold Petitioners' due process rights were not violated. *See Hope v. Charlotte-Mecklenburg Bd. of Educ.*, 110 N.C. App. 599, 603, 604, 430 S.E.2d 472, 474, 475 (1993) ("The record contains no evidence of bias or unfair prejudice. . . . To decide that these facts alone are sufficient to establish bias or unfair prejudice would amount to a per se rule of unconstitutionality, completely disregarding the presumption that the Board acted correctly and the presumption of honesty and integrity in those serving as adjudicators."). Petitioners' argument on this basis is overruled.

## 2. *Delegation of Legislative Authority*

Petitioners also argue the Board's modification of MZO §§ 605–06 and 705 constituted an impermissible exercise of legislative authority. Alternatively, Petitioners contend the Board essentially granted a variance and thereby violated N.C. Gen. Stat. § 160D-406(j) because it failed to comply with MZO § 310.42's variance requirements.[8] *See* N.C. R. App. P. 28(c). We disagree.

---

[8] The Board's actions do not amount to the granting of a variance because the Board authorized the use of "property in a way that is identified as a special exception" in the zoning ordinance—i.e, a "permitted exception." *Special Use Permit*, Black's Law Dictionary. By contrast, a variance "is an authorized violation of a zoning ordinance." *Id.*; *see also* N.C. Gen. Stat. § 160D-102(30) ("Special use permit. – A permit issued to authorize development or land uses in a particular zoning district upon presentation of competent, material, and substantial evidence establishing compliance with one or more general standards requiring that judgment and discretion be exercised as well as compliance with specific standards. The term includes permits previously referred to as conditional use permits or special exceptions."); *see also Mann Media*, 356 N.C. at 10, 565 S.E.2d at 15 (citation omitted) ("A special use permit is 'one which is expressly permitted in a given zone upon proof that certain facts

Although Petitioners presented these arguments in their PWC, the trial court's order does not address them. "Under such circumstances the appellate court can determin[e] how the trial court *should have* decided the case upon application of the appropriate standards of review." *Morris Communs. Corp. v. City of Bessemer*, 365 N.C. 152, 158–59, 712 S.E.2d 868, 872 (2011) (citation and quotation marks omitted). Here, "[b]ecause the appellate record permits us to meaningfully review" Petitioners' issue, "we elect not to remand this case to the superior court[.]" *NCJS v. City of Charlotte*, 255 N.C. App. 72, 77, 803 S.E.2d 684, 689 (2017); *see also, e.g., Morris Communs. Corp.*, 365 N.C. at 159, 712 S.E.2d at 872–73.

"[T]he line dividing administrative powers which may be delegated from legislative powers which may not be delegated is not sharp and clearly defined." *Jackson v. Guilford Cnty. Bd. of Adjustment*, 275 N.C. 155, 164, 166 S.E.2d 78, 84 (1969). "[T]he governing principle, applicable to the delegation of powers by the General Assembly to State agencies, is also applicable to determine what powers may

---

and conditions detailed in the ordinance exist.'"); *see also, e.g., Jackson v. Guilford Cnty. Bd. of Adjustment*, 275 N.C. 155, 165, 166 S.E.2d 78, 85 (1969); *see also* James A. Webster, Jr., *2 Webster's Real Estate Law In North Carolina* §§ 32.19–20 (Michael B. Kent, Jr., James B. McLaughlin, Jr. & Patrick K. Hetrick, eds., 6th ed. 2024); *see also* 30A Strong's North Carolina Index 4th *Special Exceptions to Zoning Ordinance* § 80 (A variance and a special use permit are distinguished in that "a variance contemplates a departure from the terms of the ordinance and is authorized where the literal enforcement of the ordinance would result in unnecessary hardships," whereas a special use permit "contemplates a permitted use in a given zone or district and is granted after a public hearing and upon a finding that all the pertinent conditions of the ordinance are satisfied."). For the reasons herein, we hold the Board appropriately interpreted the requirements and exceptions as stated in the MZO. Accordingly, we decline to address this alternative contention by Petitioners.

be conferred by a city or county upon its board of adjustment in a zoning ordinance."

*Id.* Generally, that governing principle provides:

> [W]hile the Legislature may delegate the power to find facts or determine the existence or non-existence of a factual situation or condition on which the operation of a law is made to depend, or another agency of the government is to come into existence, it cannot vest in a subordinate agency the power to apply or withhold the application of the law in its absolute or unguided discretion.
>
> [B]y the decided weight of authority, the rule is that if the statute requires or authorizes the court or other agency to pass upon questions of public policy involved, there is an attempted delegation of legislative power and the statute is invalid.

*Id.* at 164–65, 166 S.E.2d at 85 (citations and quotation marks omitted). That said, the legislature still possesses a degree of flexibility when laying down policies and establishing standards:

> Since legislation must often be adapted to complex conditions involving numerous details with which the Legislature cannot deal directly, the constitutional inhibition against delegating legislative authority does not deny to the Legislature the necessary flexibility of enabling it to lay down policies and establish standards, while leaving to designated governmental agencies and administrative boards the determination of facts to which the policy as declared by the Legislature shall apply. Without this power, the Legislature would often be placed in the awkward situation of possessing a power over a given subject without being able to exercise it.

*Carolina-Virginia Coastal Highway v. Tpk. Auth.*, 237 N.C. 52, 60, 74 S.E.2d 310, 316 (1953) (citation omitted).

With that in mind, "[a] special exception within the meaning of a zoning ordinance is one which is expressly permitted in a given zone upon proof that certain facts and conditions detailed in the ordinance exist. It is granted by the board, after a public hearing, upon a finding that the specified conditions have been satisfied." *In re Ellis*, 277 N.C. 419, 425, 178 S.E.2d 77, 80–81 (1970). "The legislative body may confer upon an administrative officer, or board, the authority to determine whether the specified conditions [ ] exist and may require a permit from such officer, or board, [ ] as a further condition precedent to the right to erect such structure in such area." *Jackson*, 275 N.C. at 165, 166 S.E.2d at 85. "[T]he delegation to such officer, or board, of authority to make such determination as to the existence or nonexistence of the specified conditions *is not a delegation of the legislative power to make law*." *Id.* (emphasis added). Indeed, "[i]f adequate guiding standards for the decision are set forth in the ordinance, th[ere] is not an unlawful delegation of legislative authority." *Cnty. of Lancaster*, 334 N.C. at 508, 434 S.E.2d at 612.

A zoning ordinance "may not delegate to the municipal board of adjustment the power to zone; that is, the power originally vested in the General Assembly to legislate with reference to the use which may be made of land and the structures which may be erected or located thereon." *Keiger v. Winston-Salem Bd. of Adjustment*, 278 N.C. 17, 23, 178 S.E.2d 616, 620 (1971) (citation omitted). An unlawful delegation of legislative authority to a board of adjustment occurs if it is "free to roam at large within its own concept of what is best for the public," *Jackson*,

275 N.C. at 166, 166 S.E.2d at 86, or if it is "free to make any determination . . . that appeals to its sense of justice." *Id.* at 164, 166 S.E.2d at 84 (quoting *Lee v. Board of Adjustment*, 226 N.C. 107, 111, 37 S.E.2d 128, 132 (1946)). Indeed, a board of adjustment "cannot deny applicants a permit in their unguided discretion . . . . The [board] must proceed under standards, rules, and regulations, uniformly applicable to all who apply for permits." *In re Ellis*, 277 N.C. at 425, 178 S.E.2d at 81.

For example, in *Jackson v. Guilford Cnty. Bd. of Adjustment*, the North Carolina Supreme Court was faced with determining whether a local board of adjustment possessed the authority to grant a "special exception" under a county zoning ordinance, or whether the provision was an impermissible delegation of legislative authority. 275 N.C. at 161–62, 166 S.E.2d at 83. There, a citizen applied to the county board of adjustment "for a special exception permitting him to establish a mobile home park with capacity for 25 mobile homes" in an area zoned for agricultural use. *Id.* at 161, 166 S.E.2d at 82. The ordinance outlined "a special exception" that the board could grant so long as certain material criteria were met. *Id.*

The citizen's application was opposed by several homeowners. *Id.* After the board granted the citizen's special use application, the homeowners petitioned the superior court for certiorari, alleging, among other things, "the delegation to the board of authority to grant special exceptions is 'an unlawful and unconstitutional delegation of power and authority to the Board of Adjustment.'" *Id.* The superior

court disagreed, holding "that the delegation to the board of authority to grant special exceptions was constitutional and lawful." *Id.*

On appeal to our Supreme Court, the homeowners maintained "that the county zoning ordinance forb[ade] the proposed use of the [citizen's] land without a properly granted exception, and the Board of Adjustment ha[d] no authority to grant the exception." *Id.* at 162, 166 S.E.2d at 83. Upon analyzing the text of the ordinance, the Court concluded that one of its requirements amounted to an unconstitutional delegation of legislative authority because it required the board to determine "what will adversely affect the 'public interest'"—a function traditionally left to our legislative bodies. *Id.* at 167, 166 S.E.2d at 86. The Court thus held that mandating the board to determine whether the special exception would "adversely affect the public interest" was "beyond the authority of the Board of County Commissioners to enact" and thus invalid. *Id.* at 167, 166 S.E.2d at 86–87. Nonetheless, the Court affirmed the trial court's decision to grant the special exception permit, noting: "The invalidity of one part of a[n] . . . [ordinance] does not nullify the remainder when the parts are separable and the invalid part was not the consideration or inducement for the Legislature [or board of county commissioners] to enact the part that is valid." *Id.* at 168, 166 S.E.2d at 87 (quoting *Bank v. Lacy*, 188 N.C. 25, 28, 123 S.E. 475, 476 (1924)) (alterations in original).

Here, unlike the ordinance in *Jackson*, the MZO does not unlawfully delegate legislative authority to the Board. MZO § 310.622 expressly grants the Board

authority to modify the applicable development standards and conditions, in accordance with the ordinance, for an applicant seeking an SUP:

> 310.622 The Use meets or will meet all of the required and applicable development standards and conditions of the Town of Montreat (including without limitation all development standards, conditions, and requirements related to utilities, parking, access, and stormwater drainage and the applicable regulations of the Zoning District in which it is located, *except as such regulations may, for each case, be modified by the Board of Adjustment*.)

(emphasis added). That said, MZO § 107 provides:

> In all Districts, every main building hereinafter erected or altered shall be located on a separate Lot, as defined in this ordinance, and in no case shall there be more than one main Building and permitted Accessory Buildings on the Lot; *provided that this requirement shall not apply to . . . certain Special Uses . . . .*
>
> Special Uses are permitted upon compliance with the additional regulations imposed by this Ordinance or the appropriate governing board.

In subsection 201, the MZO defines a "Special Use" as:

> A specific Use which may be permitted in a Zoning District by the Board of Adjustment subject to the Board's findings that the Use would not adversely affect adjacent property or the health, safety or general welfare of persons in the area adjacent to the Use. Such Use may be permitted only in a Zoning District where said Use is specifically listed as a Special Use.

The Board also referenced MZO § 705, which expressly provides an exception to the parking area requirements: "When determining parking area requirements for

individual Uses, portions of public Streets may not be considered as permissible for parking *unless part of an overall parking plan developed to accommodate new construction, alterations to, or changes in Use of, existing Buildings*[.]" (emphasis added).

Pursuant to MZO §§ 310.622 and 107, the Board interpreted the MZO to "allow more than one principal building per lot and/or two accessory buildings on a lot in a residential zoning district"; and interpreted MZO § 705 "to count existing, perpendicular on-street parking towards the overall parking requirement." The Board found they had "authority to modify applicable development standards pursuant to Section 310.622 of the Ordinance or to waive application of a development standard in certain Special Use Permits pursuant to Section 107 of the Ordinance." Despite the Board's usage of the words "modify" and "waive," the record does not show a modification or waiver of the MZO's provisions. Instead, the record shows the Board adhered to the plain language of the MZO.

Article V of the MZO outlines the special uses that may be granted in accordance with the relevant zoning district, including the "Institutional/Residential Zoning District" at issue here. That Article references MZO § 310.6, expressly stating: "The uses indicated by the letter 'S' will be permitted but only as a 'Special Use Permit' and must first be approved in accordance with the provisions of Section 310.6 of this Ordinance. *Uses which are not listed in the Table are not permitted by the Town of Montreat.*" (emphasis added). Thus, the MZO specifically delineates the

special uses which the Board could grant a special use permit for, including hotels in the "Institutional/Residential Zoning District." That is, the term "certain special uses" applies to "certain uses" predetermined to require the procedure of the special use permit application under MZO § 310.6. *See Schooldev*, 386 N.C. at 776–77, 909 S.E.2d at 184 (citation and quotation marks omitted) ("[T]his Court will resolve any well-founded doubts about a provision's meaning in favor of the free use of land.").

Contrary to Petitioners' urging, we hold the provisions of the MZO do not impermissibly delegate legislative authority to the Board. The Ordinance "does not set the Board of Adjustment free to roam at large within its own concept of what is best for the public." *Jackson*, 275 N.C. at 161–62, 166 S.E.2d at 83. Nor does it grant the Board "absolute or unguided discretion." *Id.* at 165, 166 S.E.2d at 85. Indeed, MZO § 310.622 only allows the Board to modify regulations if the Ordinance expressly provides for such modifications. To that end, MZO § 107 expressly provides that its provision limiting the amount of principal and accessory buildings *does not apply* to "certain Special Uses[.]" And MZO § 705 expressly provides the scenarios whereby the Board may include portions of the public streets when considering "parking area requirements." Thus, the provisions of MZO §§ 107, 310.622, and 705 do not amount to an impermissible delegation of "the power to zone," *Keiger*, 278 N.C. at 23, 178 S.E.2d at 620, since the Board was not free to "change or add to the law as fixed in the ordinance." *Jackson*, 275 N.C. at 166, 166 S.E.2d at 86. Phrased another way, "it is the ordinance, not the Board of Adjustment which determines the

circumstances, the existence of which calls into play the provision for the exception[s], the board having authority to determine only the existence or absence of those circumstances." *Id.* We therefore hold MZO § 310.622 does not unlawfully delegate legislative authority to the Board.

## C. Contested Issues of Fact

Last, we address Petitioners' contention that the Board failed to resolve "contested issues of fact" in violation of N.C. Gen. Stat. § 160D-406(j). Alternatively, Petitioners maintain the Board erroneously delegated the responsibility of determining contested facts to the attorneys of record.[9] *See* N.C. R. App. P. 28(c). We disagree.

To reiterate, a reviewing court examines whether a board of adjustment's decision was "inconsistent with applicable procedures specified by statute or ordinance" de novo. N.C. Gen. Stat. § 160D-1402(j)(1)(c), (2). And since we have already determined the MRA satisfied its evidentiary burden, our task remains to review "the trial court's order for errors of law." *ACT-UP Triangle*, 345 N.C. at 706, 483 S.E.2d at 392 (quotation marks and citation omitted). Subsection 160D-406(j) provides:

> The board shall determine contested facts and make its
> decision within a reasonable time. . . . Every quasi-judicial

---

[9] Petitioners made these arguments in their PWC, but the trial court failed to address these arguments in its order. Notwithstanding, we proceed with our review since we are able to conduct meaningful appellate review over this assignment of error. *See NCJS*, 255 N.C. App. at 77, 803 S.E.2d at 689; *see also, e.g., Morris Communs. Corp.*, 365 N.C. at 159, 712 S.E.2d at 872–73.

> decision shall be based upon competent, material, and substantial evidence in the record. Each quasi-judicial decision shall be reduced to writing, reflect the board's determination of contested facts and their application to the applicable standards, and be approved by the board and signed by the chair or other duly authorized member of the board.

N.C. Gen. Stat. § 160D-406(j). Petitioners' argument rests on the assumption that the Board failed to "determine contested facts and make its decision" because it delegated "the responsibility of determining contested facts to its attorney." However, in doing so, Petitioners fail to indicate which findings were contested and unresolved, or when the Board delegated its fact-finding function to the attorneys of record. *See* N.C. R. App. P. 28(b)(6).

In any event, our review of the Board's order reveals that the Board resolved contested issues of fact with respect to: the stormwater and erosion control plan; the methods used by the competing appraisers to determine the effect on the value of nearby properties; and the impact of the landscape plan on the nearby homeowners' line of sight. We hold Petitioners' argument lacks merit and therefore is overruled.

## IV. Conclusion

For the above reasons, we hold the trial court committed error by reversing the Board's decision that granted the MRA's SUP application. Contrary to the trial court's order, the Board's decision to admit Mr. Moore's expert testimony did not violate subsection 160D-1402(j), the MRA's application for the SUP was supported by substantial evidence, and the Board did not violate Petitioners' due process rights.

Finally, we hold the MZO did not unlawfully delegate legislative authority to the Board, and the Board adequately resolved all contested facts when rendering its decision. Accordingly, we reverse the trial court's order.


REVERSED.

Judge GORE concurs.

Judge MURRY concurs in result only.

Report per Rule 30(e).